## MASTER AFFIDAVIT

I, Keith C. Whitmore, being duly sworn, state as follow:

### Introduction

1.       I am a Task Force Agent (TFA) with the Drug Enforcement Administration (DEA), Miami Field Division, and am currently assigned to the DEA Orlando District Office Tactical Diversion Squad (TDS).   The TDS is composed of DEA Special Agents (SA), DEA Diversion Investigators (DI), and deputized TFAs charged with investigating drug trafficking and money laundering offenses specifically related to the diversion of pharmaceutical controlled substances.   I have been employed as a TFA with DEA since July 2011.   From November 2001 until April 2002, I was a sworn Reserve Police Officer for the City of Winter Springs.   In April 2002, I became a fully sworn Police Officer for the City of Winter Springs.   From February 2007 until July 2011, I was assigned to the Seminole County Sheriff's Office (SCSO), City/County Investigative Bureau (CCIB), as a sworn Seminole County Deputy.

2.       I have successfully satisfied the Florida Standards and Training Requirements by attending Seminole Community College, which included training in controlled substance identification and enforcement courses.   I am also a certified Police Officer in the State of Florida.   During my law enforcement career, I have conducted physical and electronic surveillance, debriefed confidential sources, participated in the execution of search warrants and arrest warrants, and analyzed telephone toll records.   I am experienced in narcotics investigations.   I have attended multiple trainings and educational courses sponsored by the Florida Department of Law Enforcement and the Department of Justice, as well as other federal and state law enforcement agencies.

1

3.     I am familiar with, and have employed, methods of investigation including, but not limited to, visual surveillance, electronic surveillance, informant interviews, interrogation, and undercover operations.   In connection with drug trafficking investigations, I have participated in and/or executed numerous search warrants, including residences of drug traffickers/manufacturers and their co-conspirators, and the proceeds obtained from unlawful drug trafficking.   I have participated in investigations involving the following types of drugs: Oxycodone, hydrocodone, cocaine, cocaine base, marijuana, and other controlled substances.   I have participated in numerous Title III investigations and interviewed witnesses and participants in drug trafficking organizations that illegally distribute prescription drugs.   These individuals have described the techniques that they used to distribute and dispense controlled substances.

4.     As a TFA, my duties include the investigation of violations of federal controlled substances laws and other criminal violations related to the illegal distribution and dispensing of controlled substances and non-controlled substances.   As part of my training and experience, I am aware that certain controlled substances are often abused and illegally diverted from what would otherwise be considered legitimate medical uses. In particular, opiate-based narcotics that are intended to legitimately treat chronic to moderately severe pain are often diverted and abused for the euphoric effect they produce, an effect similar to that associated with heroin use.   I also know that individuals who abuse these types of drugs are at risk for becoming physically dependent on the drugs.

5.     I have investigated individuals and organizations that illegally disburse or dispense controlled substances under the guise of operating seemingly legitimate

2

medical clinics (colloquially known as "pill mills"). These "pill mills" operate as pain management clinics, emergency care or "urgent care" clinics, or other similarly characterized clinics. Typically, an individual who seeks to abuse or illegally divert controlled substances will visit one of these medical clinics. At the medical clinic, the physician issues a prescription for a controlled substance, often without performing the minimal professionally required medical assessment of the patient's complaints or properly evaluating whether disbursing the controlled substances is medically appropriate. As a result, these pill mill clinics attract large numbers of individuals who often travel long distances seeking prescriptions from these physicians. Additionally, it is not unusual in these investigations for the owners, staff, and physicians at the medical clinics to dispense the controlled substances themselves, or to refer patients to particular pharmacies that are known to fill the illegitimate prescriptions for controlled substances.

6. The information in this affidavit is based on my personal knowledge of, and participation in, this investigation, information from other criminal investigators and law enforcement officers, information from confidential sources, information from insurance companies, pharmacies, financial institutions, other business entities, and state and federal administrative agencies, as well as other documents and records obtained by law enforcement during the course of this investigation. The information set forth herein is provided solely for the purpose of establishing probable cause in support of the civil forfeiture complaint. Because this affidavit is submitted for the limited purpose of establishing such probable cause, it does not include all of the details of this investigation of which I am aware.

3

7.      Unless otherwise noted, where in this affidavit I assert that a statement was made, the information was provided by another law enforcement officer with whom I have spoken or whose report I have read and reviewed.   Such statements are not reported in their entirety, unless otherwise indicated.   Similarly, information resulting from surveillance, except where otherwise indicated, does not set forth my personal observations, but rather, has been provided to me directly or indirectly through other law enforcement officers who conducted or reviewed such surveillance.

## Purpose of this Affidavit

## I.    Real Properties Sought for Forfeiture

8.      This affidavit is being submitted for the limited purpose of supporting the civil forfeiture complaint against real properties located at:

  a) 1690 Sawgrass Drive SW, Palm Bay, Florida;

  b) 3740 Corey Road, Grant Valkaria, Florida;

  c) 712 Norse Street NW, Palm Bay, Florida;

  d) 2310 Wood Street, Melbourne, Florida;

  e) 784 Trinidad Avenue SE, Palm Bay, Florida;

  f) 117   Circle SE, Palm Bay, Florida;

  g) 742 Donau Avenue NW, Palm Bay, Florida; and

  h) 765 Hall Road, Malabar, Florida.

## Structure of this Affidavit

9.      This affidavit is divided into separate sections to present the information contained herein to the Court.   First, I provide a "Summary of the Investigation" that gives an overview of the evidence that is the subject of this affidavit.   Second, I provide a "Brief

Background of the Subjects and Related Entities," in which I introduce the subjects of this affidavit.   Third, I provide the "Statutory and Administrative Authority Underlying the Distribution and Dispensing of Controlled Substances" that are relevant to my investigation.   Fourth, I detail "Common Terms Used in Pharmaceutical Investigations." Fifth, I detail "Indicators of Conduct Outside the Accepted Standards of Medical Practice." Sixth, I detail the "Probable Cause" that supports the offenses which gives rise to the forfeiture of the Defendant Properties.   Specifically, I discuss surveillance, interviews of current and former patients of **Professional Pain Center, Inc.** (the "**Target Clinic**"), and statements of arrests associated with the **Target Clinic**.   I also detail an analysis of the Prescription Drug Monitoring Program relevant to the **Target Clinic** and provide a summary of Prescription Profiles of out-of-town patients that visited the **Target Clinic**. As part of the probable cause, I also review the suspension of one of the **Target Clinic** doctor's medical license.   Furthermore, I detail undercover visits by law enforcement to the **Target Clinic**.   I also discuss overdose deaths associated with the **Target Clinic**. I further detail the crime statistics associated with neighboring businesses of the **Target Clinic**.   Also included in the probable cause section is a medical expert opinion of the **Target Clinic's** operations.   The next sections of the affidavit address "Cash Payments" received by the **Target Clinic** and I review the "Financial Analysis" and outline the financial investigation related to the forfeiture of the Defendant Properties.

### Summary of the Investigation

10.   Using of a variety of investigative techniques including surveillance, undercover officers posing as patients, interviews with sources of information, confidential sources, and interviews with former employees, the investigation determined

that JAMES Long and Daniel BOGAN utilized the **Target Clinic** to illegally facilitate the prescribing of controlled substances outside the accepted standards of medical practice, for no legitimate medical purpose in exchange for monetary gain, primarily cash.

11.     Over the course of this investigation, JAMES Long and Daniel BOGAN employed approximately ten (10) physicians at the **Target Clinic** that were willing to write unlawful and invalid prescriptions for controlled substances.   Furthermore, the investigation revealed that JAMES Long and Daniel BOGAN utilized an office staff that falsified documents and ignored obvious signs of illegitimate MRIs.

12.     A financial investigation of the targets' bank account activities showed that the subjects of the investigation deposited excessive amounts of cash proceeds from the **Target Clinic** into their personal bank accounts.   The subjects also made cash deposits directly into their personal accounts in lieu of the **Target Clinic's** operating accounts. This practice is inconsistent with the way a legitimate business would operate.

13.     In addition, the majority of the cash deposits into the **Target Clinic's** operating account and the subjects' personal accounts occurred on the same day and in amounts less than $10,000. However, when taken together, these cash deposits totaled more than $10,000, which is consistent with structuring behavior. By depositing monies into their personal accounts in lieu of the **Target Clinic's** operating account, and structuring such deposits, the subjects are concealing the source of the money obtained by illicit means and avoiding anti-money laundering reporting requirements.

### Brief Background of the Subjects of the Investigation and Related Entities

14.     **James Long** (JAMES), according to records maintained with Florida Department of Health License Verification (FDHLV), has no medical license.   According

6

to the Florida Department of Corporations (FDC), JAMES is listed as a corporate manager of BMS Enterprises, LLC.   Also according to FDC, JAMES is also listed as the president of J & L Lawn Care and Masonry, Inc.

15.     **Brandy Long** (BRANDY), according to records maintained with the FDHLV, has no medical license.   According to bank records obtained during this investigation, BRANDY is a paid employee of the **Target Clinic** and is also a corporate officer of BMS Enterprises, LLC.   BRANDY is married to JAMES.

16.     **Daniel Bogan** (BOGAN), according to records maintained with FDHLV, has Florida Medical License PMD501404.   BOGAN's profession is listed as a paramedic.   However, his medical license was revoked on February 19, 2009 after BOGAN pled no contest to violating Florida Statute 893.13 (prescription fraud).

17.     **DOCTOR-1**, according to records maintained with the Florida Department of Health Practitioner Profile (FDHPP), is a licensed medical doctor.   DOCTOR-1 is an attending physician at the **Target Clinic** and he lists his primary practice address as the **Target Clinic**.   DOCTOR-1's claimed area of specialty is ophthalmology, with a certificate in pain management.   According to Medicaid records, DOCTOR-1 is a Medicaid provider with two Medicaid numbers, 264788500 and 264788501, which are not active.   DOCTOR-1 also holds DEA Registrant Certificate AP1539836.   The DEA Registrant Certificate gives the authority to prescribe controlled substances so long as the prescription is valid and authorized by law.

18.     The **Target Clinic**, according to the FDC is as an active corporation within the State of Florida with an effective date of October 27, 2009.   It is located in Longwood, Florida.   Article VII of the Electronic Articles of Incorporation for the **Target Clinic** lists

7

JAMES as President and BOGAN as Vice President.   However, in 2010, the State of

Florida began requiring pain management clinics to be owned by an attending physician.

Consequently, on January 18, 2011, DOCTOR-1 became an officer of the corporation.

Also, on January 18, 2011, DOCTOR-1 opened a corporation with the business and

mailing address of the **Target Clinic**.   The **Target Clinic**, according to records

maintained in the FDHLV, is a licensed pain management clinic with Florida Medical

License PMC1212.   The FDHPL lists another Florida Medical License (PMC857) for the

**Target Clinic** that was administratively revoked.   There are no other medical licenses for

the **Target Clinic** and it does not participate in the Medicaid program.

19.   **DOCTOR-2**, according to records maintained in the FDHPP, is a licensed

medical doctor.   DOCTOR-2 lists his primary practice address as the **Target Clinic**.

DOCTOR-2's listed area of specialty is anesthesiology.   According to Medicaid records,

DOCTOR-2 is a Medicaid provider with active Medicaid number 039705900.

DOCTOR-2 also has Medicare number 9148T.   DOCTOR-2 holds DEA Registrant

Certificate AZ1568471 which gives the authority to prescribe controlled substances so

long as the prescription is valid and authorized by law.   As further described in this

affidavit, DOCTOR-2 worked at the **Target Clinic** from April 2010 through December

2012.   On December 12, 2012, DOCTOR-2 signed an agreement with the Florida

Department of Health that suspended his medical license.

20.   **DOCTOR-3**, according to records maintained with the FDHPP, is a licensed

medical doctor.   DOCTOR-3 lists his primary practice address as the **Target Clinic**.

According to the FDHPP, DOCTOR-3's area of specialty is family medicine.   According

to Medicaid records, DOCTOR-3 does not participate in the Medicaid program.

DOCTOR-3 also holds DEA Registrant Certificate FS1953822, which gives the authority to prescribe controlled substances so long as the prescription is valid and authorized by law.

21.      **BMS Enterprises, LLC.**, (BMS Enterprises) according to records maintained with the FDC, became an active limited liability company on March 28, 2011. BMS Enterprises' Articles of Organization lists JAMES and BRANDY as managers of the corporation.   BMS Enterprises lists an address as 117 Ridgemont Circle SE, Palm Bay, Florida, which is where JAMES and BRANDY used to reside.   Based on the investigation and as described in this affidavit, I believe BMS Enterprises business was set up in order to manage several rental properties purchased by JAMES and BRANDY with proceeds obtained from or traceable to the **Target Clinic**.

22.      **EMPLOYEE-1**, according to records maintained with the FDHLV, has no medical license.   EMPLOYEE-1 is an employee of the **Target Clinic**.   EMPLOYEE-1 is BRANDY's mother.

23.      **EMPLOYEE-2**, according to records maintained with the FDHLV, has no medical license.   EMPLOYEE-2 is a security guard at the **Target Clinic** and is JAMES' father.

24.      **EMPLOYEE-3**, according to records maintained with the FDHLV, has no medical license and is an employee of the **Target Clinic**.   EMPLOYEE-3 is JAMES' daughter.

25.      **EMPLOYEE-4**, according to records maintained with the FDHLV, has no medical license and is an employee of the **Target Clinic**.

9

26.   **DOCTOR-4**, according to records maintained in the FDHPP, is a licensed medical doctor.   According to FDHPP, DOCTOR-4's area of specialty is internal medicine.   DOCTOR-4 also holds a DEA Registrant Certificate FC0585111, which gives the authority to prescribe controlled substances so long as the prescription is valid and authorized by law.   According to financial records, DOCTOR-4 briefly worked at the **Target Clinic** in May 2011.   In October 2012, DOCTOR-4 was rehired at the **Target Clinic** and remains employed there.

27.   **DOCTOR-5**, according to records maintained in the FDHPP, is a licensed medical doctor.   According to FDHPP, DOCTOR-5's area of specialty is family medicine. The FDHPP does not list any other medical licenses or certificates for DOCTOR-5. DOCTOR-5 holds DEA Registrant Certificate FB2724044, which gives the authority to prescribe controlled substances so long as the prescription is valid and authorized by law. DOCTOR-5 is currently employed at the **Target Clinic**.

28.   **DOCTOR-6**, according to records maintained in FDHPP is a licensed medical doctor.   According to FDHPP, DOCTOR-6's area of specialty is internal medicine.   DOCTOR-6 holds DEA Registrant Certificate BJ5986356, which gives the authority to prescribe controlled substances so long as the prescription is valid and authorized by law.   According to financial records, DOCTOR-6 worked at the **Target Clinic** from the middle of August 2011 until September 17, 2010.

29.   **DOCTOR-7**[1], according to records maintained in the FDHPP, is a licensed medical doctor.   According to FDHPP, DOCTOR-7's area of specialty is radiology.

---

[1]      DOCTOR-7 voluntarily relinquished his Florida Medical License on February 15, 2012 after an incident in North Carolina where the North Carolina Medical Board

DOCTOR-7 held DEA Registrant Certificate BW2610283, which gives the authority to prescribe controlled substances so long as the prescription is valid and authorized by law. DOCTOR-7 worked at the **Target Clinic** in January 2011.

30.     **DOCTOR-8**, according to records maintained in the FDHPP, is a licensed medical doctor.   According to FDHPP, DOCTOR-8's area of specialty was family medicine.   DOCTOR-8 held DEA Registrant Certificate FP1014113.   However, DOCTOR-8 was arrested on October 17, 2011 by DEA's Jacksonville District Office and was subsequently indicted.   DOCTOR-8 was charged with violating 21 U.S.C. § 846 in Case Number 3:11-cr-5(S1)-J-20JRK.   On March 20, 2012, DOCTOR-8 surrendered his DEA Registrant Number.   DOCTOR-8 worked at the **Target Clinic** in April 2011.

31.     **DOCTOR-9**, according to records maintained in the FDHPP, is a licensed doctor of osteopathic.   According to FDHPP, DOCTOR-9's area of specialty is anesthesiology.   DOCTOR-9 holds DEA Registrant Certificate FS3444015, which gives the authority to prescribe controlled substances so long as the prescription is valid and authorized by law.   DOCTOR-9 worked at the **Target Clinic** in March 2012.

32.     **DOCTOR-10**, according to records maintained in the FDHPP, holds a Bachelor of Medicine, Bachelor of Surgery.   The FDHPP lists no other medical license or certificates for DOCTOR-10.   DOCTOR-10 holds DEA Registrant Certificate FN2958936, which gives the authority to prescribe controlled substances so long as the prescription is valid and authorized by law.   DOCTOR-10 worked at the **Target Clinic**

---

reprimanded DOCTOR-7 for failing to conform to minimal standards of acceptable medical practice. DOCTOR-7's DEA registrant number was also retired.

from the end of March 2012 until the middle of April 2012.   DOCTOR-10 again worked at the **Target Clinic** for one week in July 2012.

33.    **J & L Masonry, Inc.**, according to FDC records, lists the registered agent and president as JAMES, with his former residence as the corporate address.   The corporation was established on April 29, 1996.   J & L Masonry, Inc. changed its name to J & L Lawn Care and Masonry, Inc. in 2009.   JAMES is currently listed as its sole officer/director.

34.    **Bones & Brew, Inc.**, according to FDC records, on October 5, 2011, JAMES and BRANDY were listed as President and Treasurer.

### Statutory and Administrative Authority
### Underlying the Distribution and Dispensing of Controlled Substances

35.    21 U.S.C. § 841 prohibits a person from knowingly or intentionally manufacturing, distributing, dispensing or possessing with intent to manufacture, distribute, or dispense, a controlled substance, except as authorized by sub-chapter I of the Controlled Substances Act, 21 U.S.C. §§ 801 through 904.   The exemption referred to in § 841 authorizes certain persons, including licensed physicians, to obtain a registration enabling them to legally distribute or dispense controlled substances "to the extent authorized by their registration."   21 U.S.C. § 822(b).   In United States v. Moore, 423 U.S. 122, 131 (1975), the Supreme Court held that, "only the lawful acts of Registrants are exempted" and that "the statutory language cannot be fairly read to support the view that all activities of registered physicians are exempted from the reach of § 841 simply because of their status."

36.     In order for a prescription to be valid and authorized by law, it must meet several requirements.   First, all "prescriptions for controlled substances shall be dated as of, <u>and signed on</u>, the day when issued . . . ."   21 C.F.R. § 1306.05(a) (emphasis added). Second, although 21 C.F.R. § 1306.05 permits prescriptions to be prepared by a "secretary or agent" for the signature of a practitioner, the regulation contemplates that the prescription be prepared before, not after, it has been signed.   The regulation states: "The prescription may be prepared by the secretary or the agent <u>for the signature of</u> a practitioner . . . ." (emphasis added).   Third, for the distribution of a controlled substance to be authorized by law, it must be prescribed "for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice."   21 C.F.R. § 1306.04(a).

37.     The DEA has determined that certain prescription medications are "controlled" based on their potential for addiction and abuse.   The DEA assigns "schedules" to these prescription medications according their potential for abuse and addiction, with a controlled substance medication in Schedule II having the highest potential for addiction and abuse.   Prescription drugs that are "controlled" are assigned to Schedule II, III, IV, or V.

38.     Under 21 C.F.R. § 1306.05, prescriptions for Schedule II, III, and IV controlled substances are required to be dated as of, and signed on, the day when issued and shall bear the full name and address of the patient, the drug name, strength, dosage form (e.g., "2mg" or "80mg"), quantity prescribed (e.g., "#120" or 120 tablets), directions for use, and the name, address and registration number of the practitioner.

39.     Oxycodone (i.e. OxyContin, Percocet, Roxicet, and Endocet) is a Schedule II controlled substance.   See 21 U.S.C. § 812; 21 C.F.R. §1308.12(b)(1).   Schedule II controlled substances are particularly dangerous.   By definition, they have "a high potential for abuse" that "may lead to severe psychological or physical dependence."   21 U.S.C. § 812(b)(2).   Schedule II controlled substances are the most dangerous drugs that can be prescribed for medical use.   See 21 U.S.C. § 812(a)(1)(B) and (C) (defining Schedule I controlled substances as having "no currently accepted medical use in treatment in the United States" and lacking "accepted safety ... under medical supervision"); 21 U.S.C. § 812(b)(3)(A), (4)(A) and (5)(A) (defining controlled substances in Schedules III, IV, and V as having a lower potential for abuse than schedule II controlled substances).

40.     Methadone is a Schedule II controlled substance.   21 U.S.C. § 812(b)(2).

41.     Hydromorphone (i.e. Dilaudid) is Schedule II controlled substance.   21 U.S.C. § 812(b)(2).

42.     Oxymorphone (i.e. Opana) is Schedule II controlled substance.   21 U.S.C. § 812(b)(2).

43.     Hydrocodone (i.e. Vicadin and Lortab) is a Schedule III controlled substance.   21 U.S.C. § 812; 21 C.F.R. §1308.13(b).

44.     Schedule IV controlled substance (i.e. Diazepam, Alprazolam, Lorazepam, and Clonazepam).   21 U.S.C. § 812; 21 C.F.R. §1308.14(c).

45.     Carisoprodol (i.e. Soma) became a DEA Schedule IV controlled substance on January 12, 2012.   21 U.S.C. § 812(b)(4).

14

46.   A non-controlled "legend drug" is a drug that is approved by the U.S. Food and Drug Administration (FDA) and is required by federal or state law to be dispensed to the public only on prescription of a licensed physician or other licensed provider.   In order to possess a non-controlled substance a prescription is required. Examples of non-controlled drugs include:

a. Tramadol (i.e. Ultracet and Ultram) is a non-controlled, narcotic-like pain reliever.

b. Ibuprofen (i.e. Ibuprofen 600 or 800 mg) is anti-inflammatory.   Ibuprofen is used to reduce fever and treat pain or inflammation caused by many conditions such as headache, toothache, arthritis, and back pain, arthritis, menstrual cramps, and/or minor injury

d. Naproxen (i.e. Aleve) is a non-controlled substance and is used to treat pain or inflammation caused by conditions such as arthritis, ankylosing spondylitis, tendinitis, bursitis, gout, or menstrual cramps.   A prescription is used for higher dosages of naproxen.

### Common Terms Used in Pharmaceutical Investigations

47.   Based on my training and experience, common terms used in a pharmaceutical diversion investigation, include but are not limited to, the following:

a. "Doctor shopper" refers to the practice of a patient requesting care from multiple physicians, often simultaneously, without making efforts to coordinate care or informing the physicians of the multiple caregivers.   Patients actively seek out other physicians to obtain more of the same medication in order to feed their addiction to that drug or divert the drug;

15

b. Magnetic Resonance Imaging (MRI) is a test that uses a magnetic field and pulses of radio wave energy to make pictures of organs and structures inside the body;

c. "Sponsor" is the head, or member, of a Drug Trafficking Organization (DTO) that pays the expenses for the "prescription fillers" employed by them.   This system allows the sponsor to acquire larger amounts of controlled substances from pharmacies due to the restrictions on pharmacists which control the amount of drugs any one person can obtain from a pharmacy in any given month;

d. "Prescription filler" is a DTO member who goes to a pain clinic to obtain a prescription for a controlled substance, fills the prescription at a pharmacy, and gives all or a part of the filled prescription to the sponsor in exchange for financial payment;

e. The Prescription Drug Monitoring Program (PDMP) shows every patient that the physician has written a prescription for a controlled substance to, the dosage units, amount prescribed, date written, date filled, which pharmacy the prescription was filled at and if the patient used Medicaid or Medicare to fill that prescription;

f. "Prescription Profile" is a document that is maintained with a pharmacy that dispensed a controlled substance.   This document shows the patients name, address, date of birth, type of drug, drug strength, dosage units, date filled, date dispensed and prescribing physician;

g. "Pill mills" are clinics used by physicians who are issuing prescriptions for controlled substances outside the course of professional practice, and without a legitimate medical purpose;

**Indicators of Conduct Outside the Accepted Standards of Medical Practice**

16

48.     Based on my training and experience, indicators of a pill mill include, but are not limited to, the following:

- cash-only business;

- no medical insurance accepted;

- "patients" travel long distances (from out-of-county or out-of-state);

- "patients" wait hours for their appointment;

- "patients" travel in groups;

- high volume of "patients" going through the clinic in short periods of time;

- during initial and follow-up visits, doctors conduct brief initial and follow-up visits with cursory physical examinations, or no physical examination;

- doctors do not undertake an independent evaluation of patient (i.e., the "patient" suggests or directs the medication to be prescribed);

- doctors write what is referred to as a "cocktail" of controlled substances which includes Oxycodone, Alprazolam, and Carisoprodal;

- doctors write prescriptions for non-controlled substances to give the appearance that the control substances prescribed are legitimate;

- doctors write similar prescriptions for all of their "patients";

- doctors do not refer "patients" to specialist or other means of treatment;

- doctors do not treat "patients" with anything other than controlled substances;

- doctors do not heed to the warnings by others that drug-seeking individuals (doctor shopper's) are trying to obtain controlled substances;

- "patients" appear and behave in a manner consistent with abusing, or being addicted to, controlled substances;

- "patients" engage in drug deals on clinic property or openly discuss diverting their prescriptions;

17

- pharmacies have stopped filling the physician's prescriptions due to suspicious activity or a high number of controlled substance prescriptions;

- clinic owners/operators and their employees direct "patients" to particular pharmacies to fill their prescriptions; and

- clinic owners/operators and their employees are hyper-aware of law enforcement;

- clinics owners/operators do not participate in government run programs (i.e. Medicare and Medicaid) to avoid any oversight by government authorities, other regulatory entities and taxation.

**Probable Cause**

Opening of the Investigation

49.    This investigation was opened in January 2011 while I was conducting an investigation into an individual for doctor shopping where DOCTOR-7 was one of the prescribing physicians.   During that investigation, I attempted to interview DOCTOR-7. At the time, I believed DOCTOR-7 was working at the **Target Clinic**.   I visited the **Target Clinic** to interview DOCTOR-7; however, the **Target Clinic's** security guard, EMPLOYEE-5[2] stated DOCTOR-7 only worked at the clinic for one (1) day and was let go because he took too long with patients.   As I was speaking with EMPLOYEE-5, I noticed that the **Target Clinic's** waiting area and parking lot was completely full.   I also noticed that an individual working at the **Target Clinic**, BOGAN, had slurred speech and his movements were slow and sluggish.

Surveillance of the Target Clinic

---

[2]    While he was working at the **Target Clinic**, EMPLOYEE-5 was on probation through the State of Florida for prescription fraud and trafficking in an opium derivative. On June 23, 2012, EMPLOYEE-5 plead nolo contendere and was sentenced to two years of probation.

18

50.     Between July 2011 through May 7, 2013, as detailed below, law enforcement surveillance of that **Target Clinic** observed high patient volumes, groups of patients arriving together, patients lined up outside before the clinic opened, and vehicles with out-of-county and out-of-state license plates.

*July 25, 2011* - During a 2-hour period, 18 individuals entered the **Target Clinic**. Additionally, 4 vehicles dropped off multiple individuals at the **Target Clinic.**

*October 10, 2011* - During a 3-hour period, 11 individuals entered and 36 individuals exited the **Target Clinic.**   Additionally, surveillance observed 7 vehicles with multiple occupants leaving the **Target Clinic**.

*May 1, 2012* - Customer-1[3] and Customer-2[4] exited the **Target Clinic** and conducted hand-to-hand drug transaction across the street from the **Target Clinic**.

*May 2, 2012* - During a 2-hour period, 26 individuals entered the **Target Clinic**. Surveillance also observed 7 vehicles drop off individuals that entered the **Target Clinic**.

*December 17, 2012* - During a 3-hour period, approximately 53 individuals entered the **Target Clinic**.   Surveillance also observed 6 vehicles, each with multiple occupants, waiting in the rear parking lot for individuals that entered the **Target Clinic**.

*May 7, 2013* - During a 1-hour period of surveillance of the front of the **Target Clinic**, 20 individuals entered and 21 individuals exited the **Target Clinic**.   Surveillance

---

[3]     On May 1, 2012, Customer-1 was arrested and charged with purchase of Oxycodone, possession of Alprazolam, and destruction of evidence.

[4]     On May 1, 2012, Customer-2 was arrested for sale of Oxycodone and distribution of Alprazolam. Customer-2 was also arrested on May 15, 2012 for violating Florida Statute 893.193(7)(a)(8) (ie. withholding information from a medical practitioner). Florida Statute 893.13(7)(a)(8) makes it illegal to withhold information from a practitioner from whom the person seeks to obtain a controlled substance or a prescription for a controlled substance.

could not be conducted on the rear entrance to the **Target Clinic**.   The **Target Clinic** remains open and active.

Interviews of Current and Former Patients of the Target Clinic

*Confidential Source*

51.     On May 7, 2012, DEA agents interviewed a confidential source (CS-1).[5] CS-1 stated that she began seeing DOCTOR-1 as a patient in approximately February 2012.   During CS-1's initial visit, DOCTOR-1 had her sit on his examination table and he began to feel her back and neck.   According to CS-1, DOCTOR-1 then placed his hand under her shirt and began to rub her back.   As DOCTOR-1 continued to rub her back, DOCTOR-1 asked if everything in the front was okay.   DOCTOR-1 then began to rub the front side of her neck.   According to CS-1, this was the only exam DOCTOR-1 did during her initial visit.   After the visit, DOCTOR-1 gave CS-1 a prescription for Oxycodone 168/30mg.

52.     CS-1 stated that he/she could not remember the exact date of her second visit.   However, during that visit, according to CS-1, DOCTOR-1 never conducted an examination or asked her any medical questions.   CS-1 stated that the only thing they discussed during the visit was CS-1's family.   After the visit, DOCTOR-1 gave CS-1 prescriptions for Oxycodone 168/30mg, Alprazolam 56/2mg, and Carisoprodol 56/350mg.

53.     CS-1 stated that she could not remember the exact date of her third visit.

---

[5]     CS-1 is an Orange County Sheriff's Office (OCSO) Confidential Source who has provided information to OCSO on one occasion.   CS-1 was not paid and did not have charges pending.   Because information provided by CS-1 has been corroborated by other aspects of this investigation, I believe CS-1 is reliable.

CS-1 stated the visit only lasted a few minutes.   When the visit was over, DOCTOR-1 walked over to CS-1 and gave her a hug.   As DOCTOR-1 was hugging CS-1, he grabbed CS-1's buttocks and crotch area, pulled CS-1 towards him, and tried to kiss her.   After the visit, DOCTOR-1 gave CS-1 prescriptions for Oxycodone 168/30mg, Alprazolam 56/2mg, and Carisoprodol 56/350mg.

*Source of Information*

54.    On September 17, 2012, agents interviewed a Source of Information (SOI-1).[6]   SOI-1 stated that she began seeing DOCTOR-1 towards the end of 2010 at the **Target Clinic**.   During SOI-1's visits, she was always accompanied by Sponsor-1.[7] SOI-1 stated that, every time they went to the **Target Clinic**, Sponsor-1 would call BOGAN to arrange for their pill fillers to quickly see a doctor and to avoid providing a urine sample.   Once the doctor visit was over, SOI-1 and Sponsor-1 would meet BOGAN at an Auto Zone, located next to the **Target Clinic**, and give BOGAN ten (10) Oxycodone pills for making the arrangements.

55.    According to SOI-1, during her first visit with DOCTOR-1, she sat in a chair in front of DOCTOR-1's desk.   DOCTOR-1 asked her what was wrong and she told DOCTOR-1 that it was her back.   DOCTOR-1 then began to rub her back and then began to touch her breast.   SOI-1 stated that she did not say anything about DOCTOR-1 touching her breast because all she cared about was getting a prescription for

---

[6]    SOI-1 is currently awaiting sentencing for trafficking cocaine in state court.   SOI-1 is cooperating in an attempt to reduce her sentence.   Where possible, the information provided by the SOI-1 has been corroborated by other aspects of this investigation. Therefore, I believe SOI-1 to be a reliable source of information.

[7]    SOI-1 identified Sponsor-1 as a sponsor and as JAMES' cousin.

21

Oxycodone. SOI-1 stated that she did not remember if DOCTOR-1 asked any medical questions or did an actual exam, other than touching her breast.   After she left DOCTOR-1's office, DOCTOR-1 began to call her all of the time and attempted to meet outside the office.

56.     SOI-1 stated that she could not recall the date of her next visit and could not remember if DOCTOR-1 asked any medical questions or conducted an actual physical examination.   SOI-1 recalled that, after she left DOCTOR-1's office, DOCTOR-1 again called her and wanted to meet with her outside of the office.

57.     SOI-1 stated that, during her third visit, DOCTOR-1 told SOI-1 that he missed her and was waiting for her visit.   During the visit, SOI-1 stated that she noticed that there was roll of paper towels and hand sanitizer in the office.   During this visit, DOCTOR-1 began touching her again and started kissing her.   DOCTOR-1 then grabbed SOI-1's hands and placed them on his penis.   SOI-1 stated she masturbated DOCTOR-1 until he ejaculated.

58.     SOI-1 stated she continued to perform the same sexual act on DOCTOR-1 on every visit until SOI-1's arrest in February 2011.

59.     I was able to locate SOI-1's prescription history from CVS Pharmacy records and the PDMP.   Based upon those records, I determined that:

- On October 1, 2010, DOCTOR-1 prescribed SOI-1 196/30mg Oxycodone, 84/15 mg Oxycodone, 56/2 mg and Alprazolam, 224/30mg Oxycodone, 84/15 mg Oxycodone and 56/2mg Alprazolam;

- On December 13, 2010 and January 11, 2011, DOCTOR-1 prescribed SOI-1 224/30mg Oxycodone, 84/15 mg Oxycodone.

60.     SOI-1 stated that she also purchased Oxycodone pills from EMPLOYEE-2

22

at his residence in Melbourne, Florida.   SOI-1 accurately described the general area of EMPLOYEE-2's residence and gave an accurate description of EMPLOYEE-2's vehicle.

*Interview of J.M.*

61.   On March 20, 2013, agents interviewed J.M. at the Seminole County Jail. J.M stated that he/she was a patient of DOCTOR-2 at the **Target Clinic** from the when it opened until his/her arrest in May 2011 for doctor shopping.

62.   J.M. stated on his/her first visit with DOCTOR-2, DOCTOR-2 had J.M. bend over, touch his/her toes and checked J.M.'s back.   DOCTOR-2 then had J.M. lay on the examination table and asked J.M. to just raise his/her legs. J.M. then stated that was the only time DOCTOR-2 performed any type of examination on him/her.   DOCTOR-2 also never asked any medical question besides the first visit. J.M. also stated that DOCTOR-2 never referred him/her to any type of medical specialist or set up any type of treatment plan for him/her.

63.   J.M's prescriptions from DOCTOR-2 included Oxycodone 112/15 mg, Oxycodone 168/30 mg, Hydromorphone 112/4mg, Hydromorphone 224/4mg, Hydromorphone 84/8mg and Alprazolam 84/2mg.

64.   J.M. stated that his/her son, daughter, and spouse also received prescriptions for controlled substances from DOCTOR-2 at the **Target Clinic**.

65.   J.M. stated that on one occasion, he/she had separate conversations with JAMES and BOGAN at the **Target Clinic**.   During the conversations, each identified themselves as the owners of the **Target Clinic**.   J.M. also stated that every time his/her daughter and son submitted a urine test at the **Target Clinic**, they tested positive for marijuana.   According to J.M., each time, **Target Clinic's** staff told him/her that it was

23

okay because it was not cocaine.   J.M. then stated that he/she mentioned their use of marijuana to BOGAN, but said that BOGAN did not care.

66.     J.M. stated that one time when he/she was doctor shopping at another pill mill clinic in Orlando, he/she saw BOGAN seeking treatment as well.   J.M. stated that he/she looked right at BOGAN, but that he did not say anything.   A few days later, after his/her visit at the pill mill clinic in Orlando, he/she had his/her scheduled appointment at the **Target Clinic**.   During that appointment, BOGAN never questioned him/her about the prior appointment at the other pain clinic in Orlando.

67.     J.M. stated that he/she sponsored numerous people at the **Target Clinic** and on numerous occasions paid BOGAN for his/her prescription fillers' visits.   J.M. added that there were other individuals who sponsored people at the **Target Clinic**. The sponsors would sit in the waiting area and also in vehicles waiting on their prescription fillers.   J.M. also stated that everyone, including the office staff, openly talked about selling pills and fake MRIs.   J.M. said that drug transactions would take place in the rear parking lot of the **Target Clinic** all the time.   There were also needles lying on the ground in the parking lot from patients injecting drugs.

68.     J.M. stated that he/she heard BOGAN tell DOCTOR-2 that DOCTOR-2 was taking too long and costing BOGAN money.   J.M. also stated that BOGAN told one the office employees that DOCTOR-2 saw 10 patients in the amount of time the other doctors saw 30 to 40.

69.     J.M. stated that, while being incarcerated at that Seminole County Jail, he/she ran into EMPLOYEE-6 who used to be an employee at the **Target Clinic**.   During the conversation, EMPLOYEE-6 told J.M. that she and BOGAN were obtaining

24

prescriptions from DOCTOR-2 after hours. EMPLOYEE-6 then told J.M. that the **Target Clinic** had Very Important People (VIPs) and the VIPS would give the employees, to include herself, BOGAN, and JAMES, extra cash or even Oxycodone pills in order to get their people at the top of the list. EMPLOYEE-6 also told J.M. that DOCTOR-2 would prescribe a higher amount of Oxycodone to female patients than male patients.

*Interview of C.N.*[8]

70.    On December 17, 2012, while conducting surveillance on the **Target Clinic**, agents observed an unknown male provide C.N. an unknown amount of money before C.N. entered the **Target Clinic**. Once C.N. exited the **Target Clinic** and entered a vehicle, an agent conducted a traffic stop on the vehicle and interviewed the occupants of the vehicle.

71.    C.N. stated that he/she had been going to the **Target Clinic** for the past three years and was a patient of DOCTOR-2. C.N. stated he/she never had a medical exam conducted on him/her by any of the doctors at the **Target Clinic**. C.N. stated that, on December 17, 2012, DOCTOR-2 was not there, therefore he/she saw DOCTOR-1. During his/her visit, DOCTOR-1 never conducted an exam or asked any medical questions. However, DOCTOR-1 wrote C.N. a prescription for Oxycodone. While talking to C.N., agents observed numerous intravenous injection sites (track marks) on C.N.'s hands and arms.

---

[8]    C.N. does not have any pending charges and has not been provided any type of compensation from the DEA. C.N. has not requested any type of compensation for the information he/she provided. Where possible, the information provided by C.N. has been corroborated by other aspects of this investigation. Therefore, I believe C.N. to be a reliable source of information.

<u>Statements of DOCTOR-2</u>

72.     On August 27, 2011, Agent Todd Smith with the Seminole County Sheriff's Office was following up on a doctor shopping investigation and engaged in conversation with DOCTOR-2.   During the conversation, DOCTOR-2 stated he saw approximately 25 patients per day.   Agent Smith asked DOCTOR-2 if there was any expectation, or if he felt pressured, to see more patients and to write more prescriptions for controlled substances.   DOCTOR-2 replied, "I would have to say yes, but I don't care if they do not like the way I conduct business."   Agent Smith asked DOCTOR-2 if the new doctor practicing in the office was replacing him or DOCTOR-1.   DOCTOR-2 replied by saying the new doctor was there for the overflow patients, two days a week.

<u>Doctor Shopping Arrests Associated with the Target Clinic</u>

73.     Between March 2011 and March 5, 2013, I identified 42 individuals from a law enforcement database that were either arrested or had charges filed against them for violating Florida Statute 893.13(7)(a)(8).   Each individual was prescribed their controlled substances from the **Target Clinic**.

<u>Prescription Drug Monitoring Program (PDMP) Analysis</u>

74.     On December 19, 2012, DEA Intelligence Research Specialist Margarita Bey requested the PDMP practitioner profile for DOCTOR-1, DOCTOR-2, and DOCTOR-3 for the period of December 1, 2010 through June 11, 2013.

75.     The following is a summary of controlled substances prescribed by DOCTOR-1 from December 19, 2012 to June 11, 2013:

| Schedule II | Dose amount | Dosage Units |
|---|---|---|
| Hyromorphone | 4 mg; 8 mg | 188706.7 |

| | | |
|---|---|---|
| Hydromorphone Powder | | 2047 |
| Morphine | 15 mg; 30 mg; 60 mg; 100 mg | 5866 |
| Morphine Sulfate | 15 mg; 30 mg; 60 mg | 74054.24 |
| Oxycodone | 10 mg; 15 mg; 20 mg; 30 mg | 223033.8 |
| Oxycodone Powder | | 7928 |
| Oxycontin | 15mg;40 mg; 60 mg; 80 mg | 1316 |
| | **Total** | 502951.74 |
| **Schedule III** | **Dose amount** | **Dosage Units** |
| Hydrocodone-Actaminophen | 10-325 mg | 84 |
| | **Total** | 84 |
| **Schedule IV** | **Dose amount** | **Dosage Units** |
| Alprazolam | .25 mg; .5 mg; 1 mg; 2 mg | 2400 |
| Carisoprodol | 350 mg | 224 |
| Clonazepham | 1 mg; 2 mg | 60164 |
| Diazapam | 5 mg; 10 mg | 81532.88 |
| Lorazepam | 1 mg; 2 mg | 33517.12 |
| Temazepam | 15 mg | 700 |
| Zolpidem | 5mg; 10 mg | 9476 |
| | **Total** | 188014 |

76.     The following is a summary of controlled substances prescribed by

DOCTOR-3 from December 19, 2012 to June 3, 2013:

| **Schedule II** | **Dose amount** | **Dosage Units** |
|---|---|---|
| Amphetamine Salts | 30 mg | 90 |
| Endocet | 10-325 mg | 100 |
| Fentanyl (Duragesic) | 25 mcg; 50 mcg; 100 mcg | 71 |
| Hyromorphone | 4 mg; 8 mg | 191583 |
| Hydromorphone Powder | | 13.296 |
| Oxycodone | 10 mg; 15 mg; 20 mg; 30 mg | 282567 |
| Oxycodone-Acetaminophen | 5-325 mg; 10-325 mg | 1850 |
| Oxycontin | 5 mg; 10 mg; 15 mg; 20 mg; 30 mg | 1251 |
| Oxycodone Powder | | 8415.403 |
| Oxymorphone | 40 mg | 300 |
| | **Total** | 486240.699 |
| **Schedule III** | **Dose amount** | **Dosage Units** |

| Hydrocodone-Actaminophen | 7.5-325 mg; 10-325 mg; 10-500 mg | 5624 |
| --- | --- | --- |
| | **Total** | 5624 |
| **Schedule IV** | **Dose amount** | **Dosage Units** |
| Alprazolam | 1 mg; 2 mg | 212 |
| Carisoprodol | 350 mg | 456 |
| Clonazepham | .05 mg; 1 mg; 2 mg | 14968 |
| Diazapam | 5 mg; 10 mg | 40322 |
| Lorazepam | 1 mg; 2 mg | 16218 |
| Temazepam | 15 mg; 30 mg | 10959 |
| Zolpidem | 10 mg | 4106 |
| | **Total** | 87241 |

77.    The following is the summary of controlled substances prescribed by

DOCTOR-3 from June 1, 2012 to December 18, 2012:

| Schedule II | Dose amount | Dosage Units |
|---|---|---|
| Amphetamine Salts | 30 mg | 30 |
| Hyromorphone | 2 mg; 4 mg; 8 mg | 103,179 |
| Metadone | 10 mg | 299 |
| Morphine | 15 mg; 30 mg; 60 mg; 100mg | 2,796 |
| Opana | 40 mg | 90 |
| Oxycodone | 5 mg; 10 mg; 15 mg; 20 mg; 30 mg | 225,051 |
| Oxycodone-Acetaminophen | 10-325 mg | 2,297 |
| Oxycontin | 40 mg; 60 mg; 80 mg; | 542 |
| | Total | 334,284 |
| Schedule III | Dose amount | Dosage Units |
| Androgel | 1% | 1500 |
| Butalbital-Codine | #3 | 100 |
| Hydrocodone-Actaminophen | 7.5-650 mg; 10-325 mg | 2,922 |
| | Total | 1,600 |
| Schedule IV | Dose amount | Dosage Units |
| Alprazolam | .25 mg; .5 mg; 1 mg; 2 mg | 19, 445 |
| Canizorodol | 350 mg | 1,511 |
| Clonazepham | .5 mg; 1 mg; 2 mg | 11,592 |
| Clorazepate | 7.5 mg | 90 |
| Diazapam | 5 mg; 10 mg | 21,169 |
| Lorazepam | .5 mg; 1 mg; 2 mg | 14,177 |
| Temazepam | 15 mg; 30 mg | 232 |
| Tramadol | 50 mg | 540 |
| Zolpidem | 5 mg; 10 mg; 12.5 mg | 3,262 |
| | Total | 49,311 |

78.    According to the PDMP, between December 1, 2010 and December 1, 2011, DOCTOR-1 wrote approximately 19,685 prescriptions of controlled substances, for approximately 1,247 patients.   The patients' ages ranged between 23 to 83 years old with approximately 56% of the patients were younger than 40 years of age and 23% younger than 30 years of age.   The following is a summary of controlled substances prescribed by DOCTOR-1 from December 1, 2010 to December 1, 2011:

29

| Schedule II | Dose amount | Dosage Units |
|---|---|---|
| Endocet | 10-650 mg | 20 |
| Hyromorphone | 4 mg | 90 |
| Morphine | 15 mg; 30 mg | 3248 |
| Oxycodone | 15 mg; 30 mg | 1538136 |
| Oxycodone-Acetaminophen | 5-325 mg | 60 |
| Oxycontin | 10 mg; 15 mg | 2631 |
| Oxymorphone | 10 mg | 56 |
| | Total | 1544241 |
| Schedule III | Dose amount | Dosage Units |
| Hydrocodone-Acetaminophen | 5-500 mg; 10-325 mg | 60 |
| | Total | 60 |
| Schedule IV | Dose amount | Dosage Units |
| Alprazolam | .5 mg; 1 mg;.2 mg | 295547 |
| Carisoprodol | 350 mg | 48442 |
| Clonazepham | 1 mg; 2 mg | 112 |
| Diazapam | 5 mg; 10 mg | 11012 |
| Temazepam | 30 mg | 28 |
| Zolpidem | 10 mg | 2697 |
| | Total | 357838 |

79.    The 19,685 prescriptions accounted for approximately 1,538,282 dosage

units of Schedule II medication, broken down as follows: 90 dosage units (D.U.) of

Hydromorphone, 56 D.U. of Oxymorphone, 56 D.U. of Roxicodone, 325,248 of

Oxycodone 15mg, and 1,212,832 of Oxycodone 30mg.   The preferred Schedule II

medication prescribed by DOCTOR-1 was Oxycodone, for a total of 1,538,080 dosage

units or 12,698 prescriptions, accounting for 65% of the total Schedule II prescriptions.

According to the PDMP, DOCTOR-1 expedited approximately 7,275 prescriptions for

Oxycodone 30mg, making it the preferred strength, followed by 5,423 prescriptions of

Oxycodone 15mg.   The preferred Schedule IV medication was Alprazolam, which

accounted for 5,755 prescriptions and/or 295,547 dosage units.

80.    From the PDMP, two prescription patterns can be observed.   The first pattern involved patients receiving two strengths of the same pain medication, Oxycodone 15mg and 30mg, in combination with a benzodiazepine, usually Alprazolam.   Both strengths of Oxycodone are short acting and can be used for breakthrough pain.   Alprazolam is a medication in the benzodiazepine family, which is a depressant used to treat anxiety, panic disorders and insomnia. The second pattern observed was the prescribing of a combination of controlled substances: pain killers, tranquilizers and muscle relaxant, known as a "drug cocktail."   Oxycodone is a pain killer, Alprazolam is a tranquilizer, and Carisoprodol is a muscle relaxant.

81.    The PDMP report listed patients with addresses throughout Northern, Southern and Central Florida, as far away as Pensacola (463 miles), Milton (438 miles), Jacksonville (132 miles), Lake City (196 miles), Vero Beach (119 miles), Bonita Springs (237 Miles), and Bradenton (139 miles), just to mention a few.

82.    Patients 30 years or younger and other patients with high dosage units of Oxycodone were selected and queried for criminal history.   A criminal records check was performed for 274 patients with at least one prescription of Oxycodone 15 mg or higher.   The criminal checks revealed that 88%, or 242 patients of the 274 patients, that were queried had criminal histories.   Most of the patients had extensive criminal records for several offenses, such as drug possession, drug possession with intent to sell or distribute, possession of prescription drugs or Schedule II and III without a prescription, fraud to obtain prescription medications, firearms violations, assault, battery, larceny, shoplifting, domestic violence, sex offenses, driving under the influence of drugs or alcohol, moving or traffic violations, probations violations, just to

31

mention a few.   Patients with drug offenses accounted for 31%, or 85 patients, and

patients with possession of prescription drugs without a prescription or fraud to obtain

prescription medication accounted for 29%, or 81 patients.

83.    The following is a summary of controlled substances prescribed by

DOCTOR-1 from December 2, 2011 to December 18, 2012;

| Schedule II | Dose amount | Dosage Units |
|---|---|---|
| Oxycodone | 10 mg; 15 mg; 20 mg; 30 mg | 1555585 |
| Endocet | 10-650 mg | 20 |
| Fentanyl (Duragesic) | 50 mcg | 10 |
| Hyromorphone | 4 mg; 8 mg | 154295 |
| Morphine | 15 mg; 30 mg | 3248 |
| Oxycodone-Acetaminophen | 7.5-325 mg; 10-325 mg | 210 |
| Oxycontin | 10 mg; 15 mg | 2631 |
| Oxymorphone | 10 mg | 420 |
|  | **Total** | 1716419 |
|  |  |  |
| Hyromorphone Powder |  | 0.80 |
| Oxycodone Powder |  | 1.50 |
|  | **Total** | 2.3 |
| **Schedule III** | **Dose amount** | **Dosage Units** |
| Hydrocodone-Acetaminophen | 10-325 mg; 10-500 mg | 285 |
|  | **Total** | 285 |
| **Schedule IV** | **Dose amount** | **Dosage Units** |
| Alprazolam | .25 mg; .5 mg; 1 mg; 2 mg | 187031 |
| Carisoprodol | 350 mg | 34664 |
| Clonazepham | .5 mg; 1 mg; 2 mg | 2763 |
| Diazapam | 5 mg; 10 mg | 18119 |
| Lorazepam | 1 mg; 2 mg | 70536 |
| Tramadol | 50 mg | 40 |
| Zolpidem | 10 mg | 5881 |
|  | **Total** | 319034 |

84.    The following is a summary of control substances prescribed by

DOCTOR-2 from December 1, 2010 to December 2, 2011:

| Schedule II | Dose amount | Dosage Units |
|---|---|---|
| Amphetamine Salts | 20 mg; 30 mg | 1260 |
| Endocet | 10-325 mg | 666 |
| Fentanyl (Duragesic) | 75 mcg; 100 mcg | 547 |
| Hyromorphone | 4 mg; 8 mg | 23083 |
| Metadone | 5 mg; 10 mg | 54912.0 |
| Methylin | 5 mg; 10 mg | 1240 |
| Morphine | 15 mg; 30 mg; 60 mg; 100 mg | 5866 |
| Oxycodone | 10 mg; 15 mg; 20 mg; 30 mg | 1381514 |
| Oxycodone-Acetaminophen | 5-325 mg; 10-325 mg | 1140 |
| Oxycontin | 30 mg; 60 mg; 80 mg | 3990 |
| | Total | 1474218 |
| Schedule III | Dose amount | Dosage Units |
| Hydrocodone-Actaminophen | 5-500 mg; 10-325 mg; 10-500 mg | 5070 |
| | Total | 5070 |
| Schedule IV | Dose amount | Dosage Units |
| Alprazolam | .25 mg; .5 mg; 1 mg; 2 mg | 235481 |
| Carisoprodol | 350 mg | 86761 |
| Clonazepham | 1 mg; 2 mg | 3585 |
| Diazapam | 5 mg; 10 mg | 31758 |
| Lorazepam | 1 mg; 2 mg | 376 |
| Temazepam | 15 mg; 30 mg | 376 |
| Zolpidem | 10 mg | 1599 |
| | Total | 359936 |

85.    The following is a summary of controlled substances prescribed by

DOCTOR-2 from December 2, 2011 to December 18, 2012:

| Schedule II | Dose amount | Dosage Units |
|---|---|---|
| Amphetamine Salts | 15 mg; 30 mg | 612 |
| Endocet | 10-325 mg | 1190 |
| Fentanyl | 75 mcg; 100 mcg | 321 |
| Hyromorphone | 1 mg; 2 mg; 4 mg; 8 mg | 265469 |
| Meperidine | 100 mg | 90 |
| Metadone | 5 mg; 10 mg | 54912.0 |

| Methadone | 10 mg | 56851 |
|---|---|---|
| Methylin | 5 mg; 10 mg | 1240 |
| Methylphenidate | 20 mg | 1598 |
| Morphine | 15 mg; 30 mg; 60 mg; 100 mg | 23456 |
| Oxymorphone | 5 mg; 15 mg | 224 |
| Opana | 5mg; 1- mg; 20 mg; 40 mg | 785 |
| Oxycodone | 10 mg; 15 mg; 20 mg; 30 mg | 880000 |
| Oxycodone-Acetaminophen | 5-325 mg; 10-325 mg | 2158 |
| Oxycontin | 10 mg; 20 mg; 30 mg; 40 mg; 60 mg; 80 mg | 7088 |
| | Total | 1295994 |
| Schedule III | Dose amount | Dosage Units |
| Dronabinol | 5 mg | 73 |
| Fiorcet | 50-325-40 mg | 60 |
| Hydrocodone-Actaminophen | 5-500 mg; 10-325 mg; | 6019 |
| Hydrocodone-Homatropine Syrup | | 1560 |
| Marinol | 5 mg | 28 |
| | Total | 7740 |
| Schedule IV | Dose amount | Dosage Units |
| Alprazolam | .5 mg; 1 mg; 2 mg | 204084 |
| Carisoprodol | 350 mg | 77441 |
| Chlordiazepoxde | 25 mg | 140 |
| Clonazepham | .5 mg; 1 mg; 2 mg | 9137 |
| Diazapam | 5 mg; 10 mg | 44949 |
| Lorazepam | .5 mg; 1 mg; 2 mg | 8666 |
| Temazepam | 15 mg; 30 mg | 906 |
| Zolpidem | 10 mg | 1805 |
| | Total | 347128 |

<u>Summary of Prescription Profiles of Out-of-Town Patients</u>

86.    On August 25, 2011, I reviewed DOCTOR-1's and DOCTOR-2's Physicians

Prescription Profiles from Walgreens and Holiday CVS Pharmacy to determine how many

patients were from outside Greater Orlando Area (i.e. Lake County, Osceola County,

Orange County, Seminole County and Brevard County) that traveled to the **Target Clinic**.

During the review of the Walgreens Physicians Prescription Profile, I located 11

individuals that were from outside the specified areas.   During the review of the Holiday

CVS Physicians Prescription Profile, I located two individuals that had Florida driver's

licenses; however, they filled their prescriptions outside Florida.[9]

DOH's Suspension of DOCTOR-2's Florida Medical License

87.    In 2010, DOH received an Administrative Complaint against DOCTOR-2.

DOH executed an administrative search warrant to obtain the medical records of the

patient, identified in the DOH administrative complaint as S.A.   According to DOH's

administrative complaint, DOCTOR-2 failed to meet the prevailing standards of care by

failing to do the following:

- failing to refer the patient to other healthcare specialist for evaluation and treatment;

- failing to refer the patient for alternative treatment, including surgical;

- failing to document the patient's medical records to justify the simultaneous prescriptions of Oxycodone, Oxycontin, Carisoprodol, and Alprazolam.

Furthermore, DOH alleged that DOCTOR-2 committed medical malpractice in violation of

Florida Statute 458.331(1)(t)(1)[10] by failing to practice medicine with the level of care of a

---

[9]    J.W. was one of DOCTOR-2's patients who filled his Oxycodone prescription in Virginia. J.W. used to live in Palm Bay, Florida, but moved to Virginia.   Every month, J.W. would travel from Virginia to the **Target Clinic** for his scheduled appointment. J.W. was arrested in Virginia on July 6, 2011 and February 22, 2012 for sale of Oxycodone.

[10]    Florida Statute 458.331(1)(t)(1) - Committing medical malpractice as defined in Florida §456.50:  "Medical malpractice" means the failure to practice medicine in accordance with the level of care, skill, and treatment recognized in general law related to health care licensure.   Only for the purpose of finding repeated medical malpractice pursuant to this section, any similar wrongful act, neglect, or default committed in another state or country which, if committed in this state, would have been considered medical malpractice as defined in this paragraph, shall be considered medical malpractice if the

reasonably prudent similar physician as being accepted under similar conditions and circumstances in the treatment of S.A.   The administrative complaint also alleged that DOCTOR-2 failed to maintain medical records that justified the course of treatment for patient S.A by:

- failing to include an adequate patient history;

- failing to document adequate justification for the controlled substance to S. A.;

- failing to document an adequate treatment plan or treatment objectives for S.A; and/or

- failing to document referrals to healthcare specialist for consultation.

88.     According to the administrative complaint, DOCTOR-2 also violated Florida Statute 458.331(1)(m)[11] by failing to maintain medical records to justify the course of treatment for S.A.   Additionally, DOH alleged that DOCTOR-2 violated Florida Statute 458.331(1)(q)[12] by inappropriately or excessively prescribing Oxycodone, Oxycontin,

---

standard of care and burden of proof applied in the other state or country equaled or exceeded that used in this state.

[11]     Florida Statute 458.331(1)(m) - Failing to keep legible, as defined by department rule in consultation with the board, medical records that identify the licensed physician or the physician extender and supervising physician by name and professional title who is or are responsible for rendering, ordering, supervising, or billing for each diagnostic or treatment procedure and that justify the course of treatment of the patient, including, but not limited to, patient histories; examination results; test results; records of drugs prescribed, dispensed, or administered; and reports of consultations and hospitalizations.

[12]     Florida Statute 458.331(1)(q) - Prescribing, dispensing, administering, mixing, or otherwise preparing a legend drug, including any controlled substance, other than in the course of the physician's professional practice. For the purposes of this paragraph, it shall be legally presumed that prescribing, dispensing, administering, mixing, or otherwise preparing legend drugs, including all controlled substances, inappropriately or in excessive or inappropriate quantities is not in the best interest of the patient and is not in the course of the physician's professional practice, without regard to his or her intent.

Carisoprodol, and Alprazolam.

89.     Based on the administrative complaint, the Board of Medicine suspended
DOCTOR-2's Florida Medical License and subsequently entered into a Stipulation
Agreement with DOCTOR-2.   DOCTOR-2 was ordered to pay a fine of $12,500 and
attend two classes.   The classes DOCTOR-2 had to attend were "Prescribing Controlled
Drugs: Critical Issues and Common Pitfalls of Misprescribing" and "Quality Medical
Records Keeping for Health Care Professionals".   DOCTOR-2 was not allowed to treat
patients for chronic and non-malignant pain.   DOCTOR-2 was not allowed to prescribe
Schedule II and III controlled substances until he successfully completed the courses.

Undercover Visits to the Target Clinic

90.     During the course of the investigation, two undercover agents (UC-1 and
UC-2) and four confidential sources (CS-2, CS-3, CS-4, and CS-5) made appointments at
the **Target Clinic** while posing as patients who were seeking prescriptions for controlled
substances.[13]   Between September 2011 and December of 2012, agents conducted 19
undercover visits to the **Target Clinic**.   During each of these undercover visits,
employees at the **Target Clinic** typically engaged in the following pattern of conduct:

    a. Clinic staff instructed patients that they must provide certain preliminary
    documents (i.e., an MRI report, a prescription profile, and waiver/discharge/referral
    from another physician) before the patient could receive an appointment to see a
    physician.

---

[13]     Unless otherwise indicated, all undercover operations conducted at the **Target Clinic** were recorded using a covert audio/video device.

37

b. Once the preliminary documents were provided, patients filled out additional paperwork about his/her medical history and the clinic staff took the patients' vitals (i.e., blood pressure).  Clinic staff then asked the patient for the location of pain and pain level on a scale of 1 to 10.

c. Patients waited for several hours at the **Target Clinic** for a brief visit with the doctor.

d. Patients were often standing up along the wall in the waiting room because there was nowhere to sit as they waited to be seen by the doctor.

e. Clinic staff instructed patients to wait in the rear parking area so that it would not bring unwanted attention to the clinic.

f. Doctors would rarely conduct any type of physical or medical examination.

g. On follow-up visits the doctor usually did not conduct and type of physical/medical examination

*September 13, 2011 - Visit by UC-1*

91.     On September 13, 2011, UC-1 went to the **Target Clinic** as a walk-in patient.   Prior to UC-1 entering the **Target Clinic**, UC-1 was provided a fictitious MRI. While UC-1 was inside the **Target Clinic**, patients were instructed to wait in the rear parking lot because the waiting area was full.

92.     BOGAN requested UC-1's MRI and prescription profile.   UC-1 explained to BOGAN that he/she did not have a prescription profile, that he/she traveled a lot and was not sure if he/she could get one.   UC-1 told BOGAN that he/she mostly bought narcotics from various people on whatever job construction site he/she was working.   BOGAN told UC-1 to wait and he would see if he could get UC-1 in to see a doctor.

38

93.    While UC-1 was waiting, he/she engaged in conversation with

EMPLOYEE-2.   During the conversation, EMPLOYEE-2 explained to UC-1 that the clinic

was always busy and that one of the doctors talked too much and that was part of the

problem.   UC-1 asked EMPLOYEE-2 which doctor talked too much and EMPLOYEE-2

indicated it was DOCTOR-2.   EMPLOYEE-2 then told UC-1 that DOCTOR-1 saw twice

as many patients as DOCTOR-2.

94.    UC-1 was not seen by a doctor because the office was completely full.

However, BOGAN instructed UC-1 to call him and said that he would get UC-1 to see a

doctor.   UC-1 called numerous times, but was never able to get through.

_September 27, 2011 - Visit by UC-1_

95.    On September 27, 2011, UC-1 returned to the **Target Clinic** with a fictitious

MRI and a fictitious prescription profile that were provided by law enforcement.   BOGAN

read over the MRI and prescription profile and told UC-1 that the paperwork appeared

sufficient and UC-1 could see a doctor.   However, BOGAN said that the doctors were

completely full and UC-1 would not be able to be seen on that day.   Consequently, UC-1

was unable to obtain a prescription.

_January 6, 2012 - Visit by CS-2_

96.    On January 6, 2012, CS-2[14] entered the **Target Clinic** and asked to be

examined by DOCTOR-1.   CS-2 already had a personal MRI, but was provided with a

fictitious prescription profile by law enforcement.   Upon entry in to the **Target Clinic**,

_____

[14]     CS-2 has been a DEA confidential source since 2010 and is working for monetary
gain.   CS-2 is reliable confidential source.   Where possible, the information provided by
the CS-2 has been corroborated by other aspects of this investigation.   Therefore, I
believe CS-2 to be a reliable source of information.

CS-2 was met by BOGAN and CS-2 provided BOGAN with his/her MRI and prescription profile.   Subsequently, BOGAN told CS-2 that the prescription profile detailed enough pain medication history that CS-2 could be seen by a doctor.   However, BOGAN warned that the doctor listed on the prescription profile, DOCTOR-11[15], had been arrested. BOGAN further informed CS-2 that his/her MRI did not show enough medical problems to be examined by a doctor.   BOGAN told CS-2 he would refer CS-2 for another MRI, but that if the MRI failed to show any injury, CS-2 would not receive any controlled substances.

### May 11, 2012 - Visit by CS-3 with DOCTOR-1

97.   CS-3[16] entered the **Target Clinic** and provided EMPLOYEE-1 with her MRI and $200.00 of serialized United States currency for the visit.   After waiting, another nurse, EMPLOYEE-7, took CS-3's blood pressure.   Throughout the visit, neither EMPLOYEE-1 nor EMPLOYEE-7 asked CS-3 about her medical condition.   CS-3 did not provide a urine sample.[17]

---

[15]     DOCTOR-11 was a physician in South Florida who was who was involved in numerous pill mills that were investigated by the DEA's Miami TDS.   On December 12, 2010, DOCTOR-11 was served with an Immediate Suspension Order.   On February 1, 2012, DOCTOR-11's DEA Registrant Number was revoked by the DEA Administrator.

[16]     CS-3 has been a DEA confidential source since 2011 and has also worked as a Brevard County Sheriff's Office.   CS-3 was a prior patient of the **Target Clinic**, but had not been to the **Target Clinic** since March 2011.   CS-3 cooperated with DEA in hope of gaining favorable consideration by the prosecution for his/her information and services. CS-3's information was independently corroborated and has been found to be reliable by the Brevard County Sheriff's Office and the DEA.

[17]     During the contact with the staff and in the waiting area the operation was recorded. However, once CS-3 entered DOCTOR-1's office, the recording device stopped recording.   The reason the recording device stopped was because had reached its allotted time for recording.

98.     Subsequently, CS-3 walked into DOCTOR-1's office and sat down in front of his desk.   DOCTOR-1 approached CS-3 and rubbed the back of her leg and stated he had never seen CS-3's tattoos during her prior visits.   DOCTOR-1 then opened CS-3's chart and commented about CS-3 missing an appointment.   CS-3 told DOCTOR-1 that she missed the appointment because he was not there.[18]   During this visit, CS-3 and DOCTOR-1 talked about family.   DOCTOR-1 also asked CS-3 if she was married, if she had kids, and the length of her relationship with her boyfriend.   DOCTOR-1 then made a comment that CS-3 seemed unhappy with her boyfriend.   While CS-3 and DOCTOR-1 were talking, DOCTOR-1 flipped back and forth through CS-3's chart.   At no time during the visit did DOCTOR-1 ask any medical questions or conduct any type of physical examination of CS-3.

99.     After the visit, DOCTOR-1 provided CS-3 with four prescriptions.   The prescriptions were for Oxycodone 168/30mg, Oxycodone 56/15mg, Naproxen 56/500mg, and Lorazepam 56/2mg.   The prescriptions were never filled.

---

[18]     While CS-3 was in DOCTOR-1's office, he/she noticed a sign on DOCTOR-1's desk that read "NO ALPRAZOLAM".   DOCTOR-1 told CS-3 that DEA told him he was not allowed to write prescriptions for Alprazolam.

41

*June 8, 2012 - Visit by CS-3 with DOCTOR-1*

100.    On June 8, 2012, CS-3 returned to the **Target Clinic** for a scheduled

appointment with DOCTOR-1.   CS-3 entered the **Target Clinic** and provided

EMPLOYEE-7 with $200.00 of serialized United States currency for her visit.

EMPLOYEE-7 took CS-3's blood pressure; however, she did not ask any medical

questions or request a urine sample.

101.    During CS-3's visit with DOCTOR-1, he discussed having congestive heart

failure and how it happened every 4 to 5 months.   DOCTOR-1 commented that CS-3's

breasts did not help with her back pain.   DOCTOR-1 then asked CS-3 if there were any

new problems and CS-3 responded that there were not; however, CS-3 asked for more

pain medication.   DOCTOR-1 told CS-3, "With those, you would need more." But CS-3

was already at the limit DOCTOR-1 was allowed to prescribe.

102.    At no time during the visit did DOCTOR-1 conduct any type of physical

examination on CS-3.

103.    After the visit, DOCTOR-1 provided CS-3 with four prescriptions.   The

prescriptions were for Oxycodone 168/30mg, Oxycodone 56/15mg, Naproxen 56/500mg

and Lorazepam 56/2mg.

*July 6, 2012 - Visit by CS-3 with DOCTOR-1*

104.    On July 6, 2012, CS-3 returned to the **Target Clinic** for a scheduled

appointment with DOCTOR-1.   While waiting for her appointment, CS-3 approached

EMPLOYEE-2 and asked what paperwork she needed to bring in order for other

individuals to the clinic (ie. sponsoring).   EMPLOYEE-2 told CS-3 that they would need

an MRI and a prescription profile.   CS-3 asked EMPLOYEE-2 what would happen if the

42

person had a doctor's referral for pain management.   EMPLOYEE-2 said that a doctor's referral for pain management would also be accepted.

105.   CS-3 asked EMPLOYEE-2 how she could be seen faster; EMPLOYEE-2 told CS-3 to talk to EMPLOYEE-1.   EMPLOYEE-2 then asked CS-3 how much she was willing to pay and CS-3 responded, "$100."[19]   CS-3 asked EMPLOYEE-2 if she should go through him and EMPLOYEE-2 responded, "You can go through me."   CS-3 then provided EMPLOYEE-2 with $100.   EMPLOYEE-2 instructed CS-3 to go to the other lobby and CS-3 was subsequently called into DOCTOR-1's office.

106.   During her visit, CS-3 and DOCTOR-1 engaged in general conversation about the July 4th holiday and discussed what type of work CS-3 did.   DOCTOR-1 then asked CS-3 about the waiting room.   CS-3 told DOCTOR-1 that there were, "a bunch of crazy people in the waiting room."   DOCTOR-1 replied that he saw them all day long. DOCTOR-1 told CS-3 that a bigger waiting room might be needed; however, that would mean more "crazy" people. While CS-3 and DOCTOR-1 were talking, DOCTOR-1 flipped back and forth through CS-3's chart.

107.   During the visit, DOCTOR-1 did not ask CS-3 any medical questions nor conduct a physical examination.

108.   After the visit DOCTOR-1, provided CS-3 with four prescriptions. The prescriptions were for Oxycodone 168/30mg, Oxycodone 56/15 mg, Naproxen 56/500mg and Lorazepam 56/2mg.

---

[19]   By CS-3 providing EMPLOYEE-2 with a $100.00 tip, he placed CS-3 ahead of other patients that had been waiting for their appointments.

*August 3, 2012 - Visit by CS-3 with DOCTOR-1*

109.    On August 3, 2012, CS-3 returned to the **Target Clinic** for a scheduled

appointment with DOCTOR-1.   CS-3 entered the **Target Clinic** and was met by

EMPLOYEE-1. CS-3 asked EMPLOYEE-1 if there was a long wait and EMPLOYEE-1

replied that there was a short wait.   CS-3 then provided EMPLOYEE-1 with $200 for her

appointment fee; CS-3 gave EMPLOYEE-1 an additional $100 in order to be placed

ahead of other patients and to avoid the need to provide a urine sample.   EMPLOYEE-1

smiled, accepted the additional money, and took CS-3 directly in to DOCTOR-1's waiting

area.

110.    During this visit with DOCTOR-1, CS-3 and DOCTOR-1 engaged in general

conversation about birthdays and music.   The only medical questions DOCTOR-1 asked

CS-3 about were about a hysterectomy and gallbladder issues.   During the visit,

DOCTOR-1 did not conduct any type physical examination of CS-3.   While CS-3 and

DOCTOR-1 were talking, DOCTOR-1 flipped back and forth through CS-3's chart.

111.    After the visit DOCTOR-1, provided CS-3 with four prescriptions. The

prescriptions were for Oxycodone 168/30mg, Oxycodone 56/15mg, 56 pills of Naproxen

56/500mg and Lorazepam 56/2mg.

*August 24, 2012 - CS-4 and CS-5's Visit to the Target Clinic*

112.    On August 24, 2012, CS-4 and CS-5 entered the **Target Clinic** purporting

to be walk-in patients.   CS-4[20] met with the receptionist and provided her with his/her

_____

[20]     CS-4 has been a DEA confidential source since 2010 and works for monetary gain.
The information provided by CS-4 has been corroborated by other aspects of this
investigation such as the recordings of the transactions.   Therefore, I believe CS-4 is a
reliable source of information.

44

MRI.  The receptionist requested CS-4's prescription profile.  CS-4 told the nurse that he/she did not have a prescription profile.  While talking to the nurse at the receptionist window, CS-4 told the nurse he/she did not like "the other stuff," referring to Percocet, and the receptionist told CS-4 that the doctor could only give him/her 30 Oxycodone pills. CS-4 then provided the nurse with $250 for his/her visit.  As CS-4 was waiting to see the doctor, he/she filled out paperwork for the **Target Clinic** and was asked to provide a urine sample.  After CS-4 provided the urine sample to an employee of the **Target Clinic**, the employee acknowledged that the urine sample was clean.

113.   CS-4 met with DOCTOR-3.  During the visit with DOCTOR-3, DOCTOR-3 went over CS-4's paperwork and asked about CS-4's pain level and medical history. DOCTOR-3 then had CS-4 bend his/her knee and touched the area that allegedly hurt.

114.   DOCTOR-3 asked CS-4 how he/she obtained his/her pain medication pills prior to coming to the clinic.  CS-4 told DOCTOR-3 that he/she obtained different types of pills from his/her family members.  DOCTOR-3 told CS-4 that he could give him/her as many pills as he/she wanted.

115.   After the visit, DOCTOR-3 provided CS-4 with prescriptions for Oxycodone 84/30mg, Ibuprofen 84/600mg and Tramadol 120/50mg.

116.   CS-5[21] met with the receptionist who requested CS-5's MRI and prescription profile.  CS-5 provided the receptionist his/her MRI.  The receptionist

---

[21]    CS-5 was a DEA confidential source until he/she was deactivated in 2013.  CS-5 was deactivated due to a lack of production, but is still available to testify.  CS-5 cooperated with DEA in hope of gaining favorable consideration by the prosecution for his/her information and services.  CS-5 was also a confidential source for the Orange County Sheriff's Office.  The information CS-5 provided has been reliable.

looked over CS-5's MRI, determined it was outdated, and instructed CS-5 that he/she

needed a current MRI.   The receptionist then provided CS-5 with a pre-written MRI

prescription purportedly signed by DOCTOR-1.   The receptionist also provided CS-5

with an MRI brochure, told CS-5 that the MRI referral would cost $100, and that the MRI

would cost $245.   The receptionist also told CS-5, because the MRI referral was $100,

when he/she came back for his/her appointment, the appointment would only cost $150.

117.   After the visit, CS-5 was provided a prescription for a MRI that was written

by DOCTOR-1.[22]

### September 10, 2012 – Visit by CS-3 with DOCTOR-1

118.   On September 10, 2012, CS-3 returned to the **Target Clinic** for a

scheduled appointment with DOCTOR-1.   CS-3 entered the **Target Clinic** and provided

EMPLOYEE-1 with $200 for his/her appointment and an additional $100 in order to be

placed ahead of other patients and to avoid having to provide a urine sample.

EMPLOYEE-1 accepted the money with a smile.   After accepting the payment,

EMPLOYEE-1 immediately directed CS-3 to DOCTOR-1's waiting area and told the other

patients in the waiting area not to worry.   While EMPLOYEE-1 was taking CS-3's vitals,

EMPLOYEE-1 told CS-3 that EMPLOYEE-1 needed to speak with CS-3 about

EMPLOYEE-1's daughter after CS-3's visit.

119.   When CS-3 entered DOCTOR-1's office, DOCTOR-1 began to rub CS-3's

back and shoulders.   DOCTOR-1 then pulled CS-3 close to him and gave CS-3 a kiss on

the side of the head.   During the visit with DOCTOR-1, CS-3 and DOCTOR-1 engaged in

---

[22]   CS-5's visit was recorded. However, due to technical difficulties the recording could not be downloaded and was not retrievable.

general conversation about animals, DOCTOR-1's heart attack, and a book CS-3 was reading. DOCTOR-1 told CS-3 that he used to be an eye surgeon, but had to stop and that was why he went into pain management. While CS-3 and DOCTOR-1 were talking, DOCTOR-1 flipped back and forth through CS-3's chart.

120. During the visit, DOCTOR-1 did not ask CS-3 any medical questions, nor did he conduct any physical examination of CS-3.

121. As soon as CS-3 exited DOCTOR-1's office, EMPLOYEE-1 approached CS-3 and directed her outside. At that time, EMPLOYEE-1 provided CS-3 with her prescription and said that there would be another person working as a receptionist at the **Target Clinic**. EMPLOYEE-1 instructed CS-3 to ensure that CS-3 contacted her during CS-3's next appointment.

122. During the visit, DOCTOR-1 did not conduct any type physical examination of CS-3. The prescriptions that EMPLOYEE-1 handed to CS-3 were for Oxycodone 168/30mg, Oxycodone 56/15 mg, Naproxen 56/500mg and Lorazepam 56/2mg.

*September 21, 2012 - Visit by CS-4 and CS-5 with DOCTOR-3*

123. On September 21, 2012, CS-4 and CS-5 returned to the **Target Clinic** for their scheduled appointments. As soon as CS-4 and CS-5 entered the **Target Clinic**, they both were met at the receptionist window by EMPLOYEE-2. While at the window, CS-4 provided EMPLOYEE-2 with $200 for his/her visit and an additional $100 in order to be placed ahead of other patients and to avoid having to provide a urine sample. EMPLOYEE-2 placed the $100 that CS-4 provided him in his pocket and walked over to an unknown female. The unknown female told CS-4 that he/she would see the doctor in twenty minutes.

47

124.   During CS-4's visit, DOCTOR-3 told CS-4 it was his/her second visit regarding a tear of his/her knee.   DOCTOR-3 asked CS-4 when he/she took the "30s" (ie. street slang for Oxycodone 30mg).   DOCTOR-3 then asked CS-4 to describe his/her pain level from 0-10 with 10 being the worst.   CS-4 told DOCTOR-3 that the pain level was "7 ½ to 8."   DOCTOR-3 told CS-4 that he would give him/her more pain pills and that they would bring the pain level down to lower than a 7.   CS-4 also told DOCTOR-3 that he/she ran out of his/her Oxycodone.   DOCTOR-3 and CS-4 then began to joke around in reference to CS-4 being physically active.   DOCTOR-3 said that, once CS-4 had his/her surgery and valid insurance, DOCTOR-3 could socialize with CS-4.

125.   DOCTOR-3 told CS-4 that what he was going to give him/her the maximum of "six (6) 30s a day."   DOCTOR-3 then told CS-4 that the "30s" should bring the pain level down to a 5.   DOCTOR-3 instructed CS-4 to use ice on his/her knee and not to drink while taking the medication.

126.   DOCTOR-3 asked CS-4 if he checked CS-4's reflexes last time because he did not write it down in CS-4's chart.   CS-4 responded, "Yes".   DOCTOR-3 then had CS-4 stand up and asked CS-4 to move his/her knee.   CS-4 complied and moved his/her knee.

127.   DOCTOR-3 told CS-4 that he was going to check with "the boss" to see if he could give CS-4 enough pills for five weeks because DOCTOR-3 would be out of town. DOCTOR-3 asked CS-4 what he/she was taking for CS-4's blood pressure and that he/she needed to take it more often.

128.   DOCTOR-3 then asked CS-4 if he/she was taking the Tramadol, if it was working, and if CS-4 wanted more. CS-4 responded by saying, "No."   DOCTOR-3 told

CS-4 that, if he had more pain, he could give him two 15s (ie. street slang for Oxycodone 15mg) on his/her next visit.   DOCTOR-3 then told CS-4 that he/she was almost at the maximum amount of pain medication that he could give him/her.

129.   After CS-4's visit, DOCTOR-3 provided CS-4 prescriptions for Oxycodone 126/30mg and Ibuprofen 63/600mg.

130.   While at the window, CS-5 provided the same unknown female employee with his/her MRI, $150 for his/her visit, and an additional $100 in order to be placed ahead of other patients.   As CS-5 was standing at the window talking to the nurse, CS-5 observed an unknown male give cash to EMPLOYEE-2.   The unknown male was taken straight to the waiting area in the rear of the clinic and, moments later, was directed into DOCTOR-3's office.

131.   CS-5 was called to the rear waiting area and provided a urine sample.   The employee told CS-5 that the urine was clean.   The employee then took CS-5's blood pressure.

132.   During CS-5's visit with DOCTOR-3, DOCTOR-3 asked CS-5 if he/she was a new patient and CS-5 responded, "Yes."   CS-5 told DOCTOR-3 how he/she had high blood pressure and how he/she had gained a lot of weight.   DOCTOR-3 asked CS-5 if anyone reviewed his/her MRI.   DOCTOR-3 then told CS-5 how to get his/her blood pressure checked and discussed the concerns of having high blood pressure.

133.   CS-5 told DOCTOR-3 about an incident that injured his/her back that he/she also had a pulmonary aneurism.   DOCTOR-3 told CS-5 not to ignore shortness of breath, chest pain, or lower extremities pain and he/she needed to stay hydrated.

134.    DOCTOR-3 then had CS-5 stand up and he explained how the body worked regarding the back and the bulging disc in CS-5's back.   DOCTOR-3 explained to CS-5 how the lumbar spine worked and described the problem with CS-5's back. DOCTOR-3 told CS-5 that he/she needed to stretch his/her back, apply heat, and stay hydrated.

135.    CS-5 told DOCTOR-3 that, when he/she coughed, he/she felt tightness in his/her back.   DOCTOR-3 asked CS-5 if he/she had health insurance and CS-5 responded that he/she did not but that he/she was trying to get disability.

136.    DOCTOR-3 told CS-5 that he was going to give CS-5 a number to a free clinic at Florida Hospital South because of his/her chest pains.   CS-5 told DOCTOR-3 that he/she had already taken care of that with the Orange County Department of Health. DOCTOR-3 told CS-5 that too much narcotics could slow down his/her breathing.

137.    DOCTOR-3 told CS-5 that they were going to concentrate on his/her lower back.   DOCTOR-3 asked CS-5 to describe the type of pain he/she was having with his/her back.   CS-5 told DOCTOR-3 that his/her back was pinching, had pain, and always aching.   DOCTOR-3 explained to CS-5 what was causing those problems and that they were going to attack it from different directions.   DOCTOR-3 explained to CS-5 how the pain medications were going to work with his/her brain and spinal cord to stop the perception of pain.   DOCTOR-3 then asked CS-5's pain level when he/she was on and off the medication. CS-5 never told DOCTOR-3 his/her pain level.

138.    DOCTOR-3 continued to talk to CS-5 about his/her problems and also performed an examination on CS-5.   DOCTOR-3 explained to CS-5 how to take the medications.

139.    After the visit, which lasted approximately 45 minutes, DOCTOR-3 provided CS-5 with a prescription for 105 Oxycodone 105/30mg, Valium 42/10mg, and Ibuprofen 63/600 mg.

*October 12, 2012 - Visit for CS-4 and for CS-5 with DOCTOR-3*

140.    On October 12, 2012, CS-4 and CS-5 returned to the **Target Clinic** for their scheduled appointments.   When both walked into the **Target Clinic,** CS-4 provided EMPLOYEE-4 with $600 as payment for both CS-4 and CS-5's visit.   Of the $600, $400 was for CS-4 and CS-5's visits and $200 was for being placed ahead of other patients and to avoid providing a urine sample.   CS-4 told EMPLOYEE-4 to split the money with EMPLOYEE-3.

141.    During CS-4's visit with DOCTOR-3, CS-4 told DOCTOR-3 what he/she had been doing and where CS-4 had been hanging out.   DOCTOR-3 asked CS-4 about his/her pain level.   DOCTOR-3 commented to CS-4 about his/her blood pressure. DOCTOR-3 then asked CS-4 if they increased it the last time (referring to the medication). DOCTOR-3 then tells CS-4 that he/she is getting it six times per day and that was pretty much the maximum.   DOCTOR-3 asked how CS-4 was doing and CS-4's response was "ok."

142.    DOCTOR-3 told CS-4 that he/she had a knee ligament tear and that he did not know if he could legally prescribe CS-4 more than the 130 pills of Oxycodone CS-4 previously prescribed.   DOCTOR-3 told CS-4 that he wanted to see how CS-4 responded as treatment progressed.   DOCTOR-3 said that CS-4 had to show that he was trying to follow through on his treatment plan, but DOCTOR-3 never actually detailed a treatment plan.

143.   CS-4 discussed a local event that was taking place, that they should hang out together, and then began discussing wine.   DOCTOR-3 told CS-4 that he would like to socialize with CS-4, but that he had to be professional with his patients.   DOCTOR-3 then asked CS-4 what time he/she would be at the event.   DOCTOR-3 again told CS-4 about being professional and that he wanted to be CS-4's friend, but that he would not be able to write CS-4 prescriptions.   DOCTOR-3 told CS-4 that, if they happened to run into each other, it would be different.   DOCTOR-3 told CS-4 that if they did it, CS-4 could not to tell anyone that he was a doctor.   DOCTOR-3 next asked CS-4 if he/she had ever been to the strip club on Lee Road.

144.   During the visit, DOCTOR-3 never asked CS-4 any medical questions or conducted any type of physical examination.

145.   Even though DOCTOR-3 told CS-4 that he did not know if he could legally increase CS-4's medication because it was a knee ligament tear, after the visit, DOCTOR-3 increased CS-4's prescriptions by to Oxycodone 168/30mg and Ibuprofen 84/600mg

146.   During CS-5's visit with DOCTOR-3, he told CS-5 that he started him/her on five 30s (ie. street slang for Oxycodone 30mg) a day and to follow up with a specialist. DOCTOR-3 asked CS-5 if he had given him/her number to a free health clinic and CS-5 responded that he went to one already.

147.   DOCTOR-3 asked CS-5 about his/her pain level was when he/she took the 30s.   CS-5 responded that he/she took 1½ Oxycodone pills in the morning and that the pain level was about a "3."   DOCTOR-3 then asked CS-5 how high the pain level would

52

get and CS-5 responded "about 7 or 8."   DOCTOR-3 then reminded CS-5 that he/she needed to take his/her medications.

148.   DOCTOR-3 told CS-5 that he would be able prescribe CS-5 "the max," referring to the maximum amount allowed prescribed.   However, DOCTOR-3 told CS-5 that once he did that, if CS-5 still had pain, the best thing he could do would be to add one valium pill.   DOCTOR-3 also asked CS-5 how the valium worked for him/her.   CS-5 never answered.   DOCTOR-3 told CS-5 that he/she was already receiving the maximum amount of Oxycodone CS-5 can take.

149.   DOCTOR-3 asked CS-5 if he/she was doing physical therapy.   CS-5 responded that he/she was not.   CS-5 told DOCTOR-3 that was the reason he/she went to the clinic and that CS-5 was still dealing with the clinic getting him/her other doctors in case CS-5 needed one.   CS-5 told DOCTOR-3 that he/she was in the process of getting the clinic to pay for it.

150.   DOCTOR-3 told CS-5 why he/she was having problems with his/her back and instructed him/her ways to loosen up the muscles so that CS-5 did not continue to have problems.   DOCTOR-3 demonstrated for CS-5 the exercises to do.

151.   DOCTOR-3 told CS-5 that he could max CS-5 out at six pills of Oxycodone per day and also asked CS-5 if he/she wanted 15s (ie. street slang for Oxycodone 15 mg).

152.   After the visit DOCTOR-3 prescribed CS-5 Oxycodone 168/30mg, Valium 56/10mg, Ibuprofen 84/600mg, and Oxycodone 56/15mg.

*October 19, 2012 - Visit by CS-3 and Attempted Visit by UC-2 with DOCTOR-1*

153.   On October 19, 2012, CS-3 and UC-2 entered the **Target Clinic** for CS-3's unscheduled appointment and a walk-in appointment for UC-2.   During the visit, CS-3

53

acted as UC-2's sponsor. Prior to UC-2 entering the **Target Clinic**, UC-2 was provided with an undercover MRI that did not show any injury and a valid prescription for pain management. After they entered the clinic, CS-3 and UC-2 met with a white female at the receptionist widow who identified herself as "Stacy." CS-3 asked Stacy if EMPLOYEE-1 or EMPLOYEE-2 was working and Stacy told CS-3 that EMPLOYEE-2 was outside. CS-3 and UC-2 exited the clinic and approached EMPLOYEE-2, who was standing outside of the clinic. CS-3 greeted EMPLOYEE-2 and EMPLOYEE-2 immediately asked if there was a problem with a urine sample. CS-3 told EMPLOYEE-2 that he/she would like to have UC-2 be seen by DOCTOR-1. EMPLOYEE-2 stated that would not be a problem and that he would go inside and talk to the office staff. CS-3 also told EMPLOYEE-2 that he/she had extra money. EMPLOYEE-2 told CS-3 that Stacey would not take it.

154. CS-3 and UC-2 re-entered the clinic and CS-3 gave Stacy UC-2's prescription for pain management and MRI.[23] Stacy told CS-3 and UC-2 that the visit would cost $200 for CS-3 and $250 for UC-2, because UC-2 was considered a new patient. CS-3 gave Stacy $900. Stacey then told CS-3 that she did not have change and CS-3 told Stacey to keep it; however, Stacey told CS-3 that she did not do that.

155. After CS-3 was called back to meet with DOCTOR-1, UC-2 stayed in the waiting room. While CS-3 was in the rear waiting area, Stacy told UC-2 that DOCTOR-1

---

[23] While CS-3 and UC-2 were waiting at the receptionist window, CS-3 overheard the nurse tell an unknown individual on the phone that the **Target Clinic** did not deal with insurance.

declined to meet with him/her; DOCTOR-1 believed the MRI did not meet certain criteria to be treated for pain management.

156.   During the visit with DOCTOR-1, CS-3 and DOCTOR-1 discussed DOCTOR-1's military service.   While CS-3 and DOCTOR-1 were talking, DOCTOR-1 flipped back and forth through CS-3's chart.   DOCTOR-1 then asked CS-3 if they were real, referring to CS-3's breasts.

157.   DOCTOR-1 told CS-3 it had been a slow day because his patients had not yet been paid.   CS-3 told DOCTOR-1 that it was possible that his patients were having problems filling their prescriptions.   DOCTOR-1 said that the patients were not having problems filling their prescriptions; they were having a problem paying the pharmacy's prices.   DOCTOR-1 said that his patients would then come back "bitching" at him to give them a prescription that they could afford.   While CS-3 and DOCTOR-1 were talking, DOCTOR-1 flipped back and forth through CS-3's chart.

158.   CS-3 started to walk out of DOCTOR-1's office and DOCTOR-1 asked her what she would be wearing next time.   DOCTOR-1 then asked CS-3 for a hug and told CS-3, "Let's not tell anyone."   As DOCTOR-1 hugged CS-3, he slapped CS-3 on her buttocks.

159.   While CS-3 was in the waiting room and waiting for his/her prescriptions, DOCTOR-1 walked up to CS-3 and said that he would see her next time.   DOCTOR-1 then ran his figure down the front of CS-3's chest, in-between her breasts.

160.   During CS-3's visit, DOCTOR-1 did not conduct any type of physical examination on CS-3.

161.    After the visit, DOCTOR-1 provided CS-3 with four prescriptions. The prescriptions were for Oxycodone 168/30mg, Oxycodone 56/15mg, Naproxen 56/500mg and Lorazepam 56/2mg.

*November 9, 2012 - Visit by CS-4 with DOCTOR-1*

162.    On November 9, 2012, CS-4 returned to the **Target Clinic** for his/her scheduled appointment and provided EMPLOYEE-3 $200 for his/her visit and an additional $100 in order to be placed ahead of other patients and to avoid having to provide a urine sample.   While CS-4 was waiting to be seen by DOCTOR-1, an unknown female patient began throwing up in the office.   An unknown female employee told the unknown female patient that she needed to leave and returned the female's money.

163.    While CS-4 was waiting, DOCTOR-1 walked out of his office and asked the female employee if the three (3) unknown individuals had disappeared.   The nurse responded that two of them left because he did not have time to see them.   The nurse told DOCTOR-1 to hurry and DOCTOR-1 responded that he needed to be thorough. The nurse told DOCTOR-1 that he did not have to be thorough because the patients did not care and that DOCTOR-1 was infringing on the nurse's drinking time.

164.    During CS-4's visit, DOCTOR-1 asked CS-4 his/her age and asked CS-4 if his/her lower back bothered CS-4.   CS-4 told DOCTOR-1 it was not his/her back, but that his/her meniscus was bothering him/her.   DOCTOR-1 asked CS-4 which knee was problematic and asked if he/she had surgery.   DOCTOR-1 told CS-4 that his daughter had the same injury.   DOCTOR-1 told CS-4 that he did not know what DOCTOR-3 did for CS-4 during CS-4's prior visits and asked CS-4 how CS-4 injured his/her knee.   CS-4 told DOCTOR-1 that it just started bothering him/her and that he/she went to the doctor to

56

have it examined.   DOCTOR-1 then asked CS-4 if there were any more medical

problems; CS-4 told DOCTOR-1 that he/she had broken his/her ankle and femur and had

to have surgery.   DOCTOR-1 told CS-4 the he could prescribe him/her with what

DOCTOR-3 previously prescribed CS-4.   While CS-4 and DOCTOR-1 were talking,

DOCTOR-1 flipped back and forth through CS-4's chart.

165.   During the visit, DOCTOR-1 did not conduct any type of physical

examination on CS-4.

166.   After the visit DOCTOR-1 wrote CS-4 prescriptions for Oxycodone

168/30mg and Ibuprofen 56/800mg.

*November 16, 2012 - Visit for CS-3 with DOCTOR-1*

167.   On November 16, 2012, CS-3 returned to the **Target Clinic** for a scheduled

appointment with DOCTOR-1.   CS-3 approached EMPLOYEE-1 and provided

EMPLOYEE-1 with $200 for the visit and an additional $100 in order to be placed ahead

of other patients and to avoid having to provide a urine sample.

168.   CS-3 asked EMPLOYEE-1 about bringing (i.e. sponsoring) another person

into the clinic with CS-3.   CS-3 told EMPLOYEE-1 that the person had a referral for pain

management and an MRI; however, CS-3 told EMPLOYEE-1 that the person did not have

a prescription profile.   EMPLOYEE-1 told CS-3 that was fine, but that the MRI had to

show some type of injury in order for her to be seen by a doctor.

169.   CS-3 then had his/her office visit with DOCTOR-1.   During the visit, the two

only engaged in a general conversation about DOCTOR-1's heart.   While CS-3 and

DOCTOR-1 were talking, DOCTOR-1 flipped back and forth through CS-3's chart.

During this visit, DOCTOR-1 did not conduct any type of physical examination on CS-3.

170.   After the visit DOCTOR-1, provided CS-3 with four prescriptions.   The prescriptions were for Oxycodone 168/30mg, Oxycodone 56/15 mg, Naproxen 56/500mg, and Lorazepam 56/2mg.

*December 21, 2012 - Visit by CS-3 and Attempted Visit for UC-2*

171.   On December 21, 2012, CS-3 and UC-2 visited the **Target Clinic**.   For CS-3, this was an unscheduled appointment and, for UC-2, this was an attempted walk-in appointment.   During this visit, CS-3 acted as UC-2's sponsor.   Prior to CS-3 and UC-2 entering the **Target Clinic**, CS-3 was provided with $900.   UC-2 was provided with a fictitious MRI and a valid prescription for pain management.

172.   After entering the **Target Clinic**, CS-3 walked to the receptionist's desk and met with EMPLOYEE-1.   CS-3 asked EMPLOYEE-1 if DOCTOR-1 could see a new patient.   EMPLOYEE-1 said he could not because it was too late.   CS-3 told EMPLOYEE-1 that he/she had the money and EMPLOYEE-1 said, "I know…I can't".   CS-3 told EMPLOYEE-1 again that he/she had a lot of money and EMPLOYEE-1 requested the MRI.   EMPLOYEE-1 said that she would have DOCTOR-1 look at it because he had to review it.   CS-3 asked EMPLOYEE-1 if she thought it would go through.   EMPLOYEE-1 reviewed UC-2's MRI and said that it was "real mild" and she would ask DOCTOR-1.   CS-3 then provided EMPLOYEE-1 with $200 and an additional $100 in order to be placed ahead of other patients and to avoid having to provide a urine sample.   CS-3 then asked EMPLOYEE-1 to see what she could do for him/her.

173.   EMPLOYEE-1 directed CS-3 straight to DOCTOR-1's waiting area.   A short time later, EMPLOYEE-1 informed CS-3 that UC-2's MRI was too "mild."   While in the waiting area, EMPLOYEE-1 approached CS-3 and told him/her that the MRI needed

to show pinching, pressing, or pulling of the back/spine in order for it to be sufficient. EMPLOYEE-1 then asked if CS-3 or UC-2 had another MRI at their home and instructed CS-3 to fax it to her when they got home.   EMPLOYEE-1 explained to CS-3 the different days and times that EMPLOYEE-1 would be available to schedule an appointment for UC-2 with DOCTOR-1.

174.   EMPLOYEE-1 then attempted to take CS-3's blood pressure, but was unable to do so because the machine was not working.   CS-3 observed EMPLOYEE-1 write on CS-3's chart.

175.   A short time after CS-3 walked into the rear waiting area, EMPLOYEE-1 walked into the front waiting room.   EMPLOYEE-1 told UC-2 that the MRI was not strong enough and that DOCTOR-1 did not feel the MRI showed enough cause for UC-2 to receive pain management.   EMPLOYEE-1 then asked UC-2 how old he/she was.   UC-2 told EMPLOYEE-1 he/she was 38 years old.   EMPLOYEE-1 stated that, at that age, UC-2 was likely experiencing pain in his/her back.   EMPLOYEE-1 asked UC-2 if his/her back hurt and UC-2 replied that his/her back was sore all over.   EMPLOYEE-1 also told UC-2 that he/she should get another MRI that showed more problems in the lower lumbar region of the back.   EMPLOYEE-1 stated the doctor at the **Target Clinic** could refer him/her for an MRI, or he/she could ask his/her primary care doctor for a MRI referral.   UC-2 told EMPLOYEE-1 that he/she would ask his/her primary doctor for a referral.

176.   During CS-3's visit with DOCTOR-1, CS-3 told DOCTOR-1 that the girl before CS-3 was in his office for a prolonged period of time.   DOCTOR-1 explained to CS-3 that it was the first time he had examined her and that she had a lot of problems.

59

DOCTOR-1 added that she was one of DOCTOR-2's patients.  DOCTOR-1 told CS-3 that DOCTOR-2 was fired from the clinic because DOCTOR-2 was over medicating. Furthermore, DOCTOR-1 told CS-3 that the Board of Medicine and the DOH were also inquiring about DOCTOR-2.  CS-3 told DOCTOR-1 that he/she thought DOCTOR-2 owned the **Target Clinic**.  DOCTOR-1 told CS-3 that the **Target Clinic** was in his name, but JAMES was the real owner and the financial backer of the **Target Clinic**.  CS-3 then commented that JAMES was the money and DOCTOR-1 responded, "Yeah". DOCTOR-1 then stated that the **Target Clinic** had to be registered in a physician's name, so it was in his name.[24]

177.    During the visit, DOCTOR-1 did not conduct any type of physical examination or ask any medical questions.

178.    After the visit DOCTOR-1, provide CS-3 with four prescriptions. The prescriptions were for Oxycodone 168/30mg, Oxycodone 56/15mg, Naproxen 56/500mg, and Lorazepam 56/2mg.

## Overdose Deaths Associated with the Target Clinic

### DOCTOR-1's patient J.J.

179.    On August 24, 2011, a 34 year-old male, identified as "J.J.," was found dead in his residence located at 870 Banana Lake Road, Lake Mary, Florida.  The death appeared to be a drug overdose.

180.    During the examination of the death scene, deputies found prescriptions at the residence indicating that DOCTOR-1 was the prescribing physician.

---

[24]    In 2010, the State of Florida changed Florida Statute 458.3265 to require pain management clinics to be owned by an attending physician.

181.    During the death investigation, J.J.'s grandmother stated that J.J. was a patient of DOCTOR-1's for pain management.   J.J.'s grandmother then stated that she drove J.J. around during the week of August 20, 2011 to different pharmacies trying to fill J.J.'s Oxycodone prescriptions from DOCTOR-1.

182.    According to the PDMP, DOCTOR-1 last saw J.J. on August 15, 2011. The PDMP also showed, on August 22, 2011, J.J. filled a prescription for Oxycodone 168/30mg.   The PDMP also showed that DOCTOR-1 was the only prescribing physician for J.J. during 2011.

183.    SCSO Investigator Eva Marie Clark spoke with J.J.'s father.   He stated that J.J. was prescribed pain medication for back pain and became addicted to Oxycodone and Alprazolam several years ago. He stated that he was not aware of J.J. having any other medical or mental problems.

184.    On October 18, 2011, I received the medical examiner's report relating to J.J.'s death.   The report stated that J.J's cause of death was Poly-Substance Toxicity (Alprazolam and Oxycodone).   J.J.'s manner of death was deemed accidental due to over self-medication.   In the toxicology report, it listed caffeine, Cotinine, Alprazolam, and Oxycodone as having been found in J.J.'s peripheral blood.   There also was a presumptive result for Opiates and Benzodiazepines in J.J's urine.

185.    On October 24, 2011, I visited six (6) pharmacies located within Seminole County, Florida and located the prescription profiles for J.J. at CVS, Walgreens, and Discount RX.   The prescription profiles showed that DOCTOR-1 was the prescribing physician from January 20, 2011 through August 20, 2011.   From January 20, 2011 through the date of J.J.'s death, DOCTOR-1 prescribed J.J. 336 pills of Oxycodone 15mg,

1008 pills of Oxycodone 30mg, and 392 pills of Alprazolam 2mg.   The last prescription that J.J. filled from DOCTOR-1 was for 56 Oxycodone 15mg, just four days before his death.

*DOCTOR-2's patient R.F. a/k/a R.M.*

186.   In October 2011, I learned that R.F. died as a result of a drug overdose on August 16, 2011.   I learned from R.F.'s mother that his birth name was R.M.; however, R.M. changed his name to have his step-fathers last name.   I contacted all of the major corporate pharmacies in the area, along with all of the independently owned pharmacies (IOP) in Brevard County, which was where R.M. resided.   The only prescription profile for R.M. was at CVS Pharmacy, 5650 Red Bug Lake Road, Winter Springs, Florida.   The CVS pharmacy technician looked up R.F. in their computer system, but was unable to locate a prescription profile.   However, the pharmacy technician was able to locate a prescription profile for R.M.   R.M.'s address on the prescription profile matched the address on his driver's license.

187.   R.M.'s prescription profile detailed that, from April 15, 2011 to the date of R.M.'s death, DOCTOR-2 was R.M.'s only prescribing physician.   From April 15, 2011 to the date of R.M.'s death, DOCTOR-2 prescribed R.M. 222 Oxycodone 15mg, 282 Hydromorphone 4mg, 672 Hydromorphone 8mg, 112 Alprazolam 1mg, and 56 Diazepam 5mg.   The last prescription that R.M. filled from DOCTOR-2 was four days before his death.

188.   On October 25, 2011, I received a copy of R.M.'s autopsy report. According to the autopsy report, R.M. died on August 16, 2011.   The cause of death was ruled as multiple drug intoxication and the manner of death was accidental.   The blood

screening revealed R.M. had the following substances in his blood: metabolite cocaine, nicotine, metabolite nicotine, caffeine, hydromorphone, cyclobenzaprine and alprazolam.

<u>Crime Statistics of Businesses Located Near the Target Clinic</u>

189.    On September 26, 2012, I obtained an Intelligence (INTEL) Bulletin from the Longwood Police Department in reference to the **Target Clinic**.   The INTEL Bulletin was an analysis of calls for service by the Longwood Police Department from 2007 through 2012 for six (6) businesses located near the **Target Clinic**, and including the **Target Clinic**.   The calls for service increased significantly for each of the six (6) businesses located near the **Target Clinic**, with the highest number of calls showing a 675% increase from the prior year.

<u>Medical Expert Opinion of the Target Clinic</u>[25]

190.    On March 22, 2013, I obtained 12 patients files from the Seminole County Sheriff's Office City/County Investigative Bureau (CCIB) of individuals that were arrested or had charges filed on them for violating Florida Statute 893.13(7)(a)(8).   Each individual was prescribed their controlled substances from the **Target Clinic**.

191.    On April 1, 2013, TFA Samuel Stephenson and I met with a medical expert in Pain Management.   I provided the medical expert with 12 patient files that were

---

[25]    For this investigation, the government retained a medical expert that is board certified with the in American Board of Anesthesiology and the American Board of Pain Medicine.   The medical expert is affiliated with the American Society of Interventional Pain Physicians and the Florida Society of Interventional Pain Physicians.   The medical expert's State Regulatory Experience is as a Medical Expert Witness in Anesthesiology/Pain Medicine, State of Florida, Agency for Health Care Administration Reporting to the Office of General Counsel/Florida Board of Medicine 1997 to present. The medical expert is a Consultant in Anesthesiology State of Florida, Agency for Health Care Administration April 2001 to Present.   The medical expert's Federal Regulatory Experience includes being a consultant in Anesthesiology/Pain Medicine for the U.S. Department of Justice, DEA, TDS from October 2009 until present.

obtained from the Seminole County Sheriff's Office, CS-3's audio/video visits with

DOCTOR-1 and CS-4 and CS5's audio visits with DOCTOR-3.   I also provided the

medical expert with the PDMP spread sheet that is included in this affidavit relating to the

prescribing conduct of DOCTOR-1, DOCTOR-2, and DOCTOR-3.

192.   The medical expert provided the following opinion:   In every patient

encounter, medical records were perfunctory and inadequate, lacking physical

examination.   There was no legitimate medical reason for prescribing large doses of

controlled substances to these patients.   The type, quantity, and combination of the

medications prescribed was excessive and potentially lethal, likely involving drug

diversion.   No reasonably prudent physician would prescribe the type, quantity, and

combination of the medications prescribed in the course of his usual professional

practice.   This pattern of inappropriate prescription of controlled substances is consistent

with fraud in the practice of medicine.

Medical Expert's Opinion of Videos of CS-3

193.   The government's medical expert reviewed video recordings of CS-3's

meetings with DOCTOR-1, dated June 8, July 6, August 3, September 10, October 19,

November 16, and December 21, 2012 were reviewed by the government's medical

expert.   DOCTOR-1 was interacting with CS-3.   At no time was a physical examination

performed.   The patient was not once questioned about her pain or activity levels.   Most

of the time was spent with idle banter, discussing dogs, music, and DOCTOR-1's heart

condition.   Appropriate physician-patient interactions would not preclude discussion of

such things, but there was no meaningful history-taking or discussion of the medical

regimen prescribed.

Medical Expert's Analysis of the PDMP

194.   The breakdowns of controlled substances prescribed by DOCTOR-1, DOCTOR-3, and DOCTOR-2 were reviewed band are extraordinarily high and clearly excessive.   In two different one-year spans, DOCTOR-1 prescribed 1.53 million and 1.55 million units of immediate release Oxycodone, not to mention tens of thousands of other Schedule II drugs.   He prescribed over 300,000 units of Schedule IV drugs in each of those years.   DOCTOR-3 prescribed almost 50,000 units of Schedule IV drugs in a 6-month span, as well as over 300,000 Schedule II drugs during that time.   DOCTOR-2 prescribed 1.7 million units of Schedule II drugs and almost 360,000 units of Schedule IV drugs in a one-year span.

195.   No physician, in the usual course of his/her professional practice, could possibly prescribe this many units of controlled substances for legitimate medical reasons.

Cash Payments

196.   Based on my training, experience, and this investigation, I know that doctor shoppers and those obtaining fraudulent prescriptions, who are typically addicts and drug traffickers, make their purchases exclusively with cash.   This is because other forms of payments, such as by credit card or insurance payment, will leave a paper trail back to the doctor shopper.   I also know, based upon my training, experience and this investigation that pill mills prefer cash payments when they illegally dispense controlled substances to avoid a paper trail, in addition to being able to profit more for the sale of the illegally dispensed controlled substance.

65

## Financial Analysis of the Target Clinic

197.    Based on my training and experience, I am aware that that pill mill operators and other traffickers of prescription drugs often place assets in names other than their own to conceal assets and avoid detection by law enforcement.   Pill mill operators and other traffickers of prescription drugs will also place assets in names of business or corporate entities as nominee title holders in order to avoid detection of these assets by government and law enforcement agencies.   Pill mill operators will accumulate and maintain substantial amounts of proceeds, specifically currency, over a period of years so that the proceeds can be used in later years for personal asset acquisitions and/or expenditures during periods when the they are no longer distributing controlled substances.

198.    A financial investigation was conducted by DEA Senior Financial Investigators (SFI) David Borah and Christopher Bik that covered time period of January 12, 2010 through January 8, 2013.

### Analysis of the Target Clinic's Operating Account

I.    **Wells Fargo Account #XXXXXXXXX8043 held in the name of Professional Pain Center**

199.    On June 6, 2010, JAMES opened checking account #XXXXXXXXX8043 held in the name of **Target Clinic** with Wachovia Bank, which later became Wells Fargo. Based upon a review of the account activity, this account is the operating account of the **Target Clinic**.   The authorized signors on this account are JAMES and BOGAN.   The address listed on the operating account is JAMES and BRANDY's residence.

66

200.   The general account activity identified in the **Target Clinic's** operating account was that there were numerous cash deposits, followed by check payments to the principals listed above, other employees, doctors, payroll and taxes associated with the **Target Clinic**.   Interestingly, there were no payments into this account from insurance companies, which would be expected with a legitimate health care provider.

201.   During the time period analyzed, the gross deposits into this account totaled approximately $5,570,259.87.   All of the deposits were in the form of cash deposits. The majority of the withdrawals, approximately $5,076,529.00, were in the form of payments to JAMES ($739,210.756), BRANDY ($390,375.71), BOGAN ($695,275.22), DOCTOR-2, DOCTOR-1, and approximately 40 other subjects that were other doctors, employees, and family members (EMPLOYEE-1, EMPLOYEE-2 and EMPLOYEE-3) who also worked at the **Target Clinic.**

202.   All of the deposits funding this account resulted from the operation of an illicit pill mill.   Additionally, this account facilitated the controlled substance offenses because it was used to pay the doctors, employees, payroll and taxes of the **Target Clinic**, as well as to enrich the core operators of the **Target Clinic**.

A.   **Structuring of Deposits Made into the Target Clinic's Operating Account and Personal Accounts of James, Brandy, and Bogan**

203.   Between June 7, 2010 and December 17, 2012, there were 1,043 cash deposits into the **Target Clinic's** operating account totaling approximately $5,570,259.87.   Based on my training, experience, and this investigation, the deposits that were made in the **Target Clinic's** operating account were done in a manner in order

to avoid the reporting requirements of 31 U.S.C. § 5313.[26]   Indeed, out of the 1,043 cash deposits into the **Target Clinic's** operating account, there were a total of 843 cash deposits, totaling $4,049,832.01, that were either deposited by the same individual, or multiple individuals, on the same day.

204.   Several personal accounts held by JAMES, BRANDY, and BOGAN also had cash deposited into them on the same day and/or consecutive days as cash deposits occurring in the **Target Clinic's** operating account.   Specifically, out of the approximately $5,570,259.87 deposited into the **Target Clinic's** operating account, JAMES, BRANDY, and BOGAN also made cash deposits totaling $874,517.51 into their personal accounts on the same day and/or on consecutive days as cash deposits were made into the **Target Clinic's** operating account. The vast majority of the cash deposited into the **Target Clinic's** operating account and JAMES, BRANDY, and BOGAN's personal accounts were in amounts less than $10,000.   However, when added together, the cash deposits occurring on the same and/or consecutive days totaled over $10,000.

---

[26]   Section 5313 and 31 C.F.R. § 103 of the Bank Secrecy Act (BSA) require any financial institution that engages with a customer in a currency transaction (i.e., a deposit or withdrawal) in excess of $10,000 to report the transaction to the IRS on Form 4789, Currency Transaction Report (CTR).   These regulations also require that multiple transactions be treated as a single transaction if the financial institution has knowledge that they are by, or on behalf of, the same person, and they result in currency either received or disbursed by the financial institution totaling more than $10,000 during any one business day.   CTRs are often used by law enforcement to uncover a wide variety of illegal activities including money laundering.   Many individuals involved in these illegal activities are aware of such reporting requirements and take active steps to attempt to cause financial institutions to fail to file CTRs.   These active steps are often referred to as "structuring" and involve making multiple cash deposits, in amounts no greater than $10,000, to multiple banks, branches of the same bank and/or different accounts on the same day or consecutive days.   Structuring is prohibited by 31 U.S.C. § 5324(a)(3).

205.    Based upon my training, experience and this investigation, I believe that JAMES, BRANDY and BOGAN structured cash deposits into their personal accounts to avoid the filing of CTRs to conceal the nature, source and location of the proceeds obtained from the **Target Clinic** in order to avoid detection of the funds from law enforcement, in violation of 18 U.S.C. § 1956(a)(1)(B)(i).    Indeed, a legitimate business would first deposit proceeds obtained from its operation into its operating account, and not directly into the personal accounts of the operators of the business.    In addition, as will be discussed below, to further conceal the nature, source and location of the proceeds obtained from the **Target Clinic**, JAMES and BRANDY commingled the proceeds obtained from the **Target Clinic** with monies obtained from other companies – legitimate (J & L Masonry, Inc.) and legitimate on their face (Bones & Brew d/b/a Beef 'O' Brady's and BMS Enterprises, LLC – in order to give legitimacy to the otherwise illegitimate funds.

**B.    Analysis of W-2's for Businesses Owned by James and Brandy**

206.    DEA obtained the W-2's of all employees of companies owned by JAMES, BRANDY, and BOGAN[27] from Paychex, Inc. (Paychex).[28]

1.    *Target Clinic's W-2's*

207.    According to the W-2's obtained from Paychex, between 2010 and 2012, the **Target Clinic** paid employees a total of $5,142,225.55 in salaries.    During this time, JAMES AND BRANDY's salaries from the **TARGET CLINIC** totaled $1,693,292.60.

---

[27]    From a review of BOGAN's bank records, it does not appear that he has any source of income other than from the **Target Clinic**.

[28]    Paycheck is a payroll processing company.

However, a review of JAMES and BRANDY's personal accounts from this same time frame show $657,357.21 in cash deposits that were not reflected on the W-2's prepared by Paychex.

208.   Between 2010 and 2012, the W-2's prepared by Paychex for BOGAN totaled $1,079,950.00.   However, a review of Bogan's personal accounts from this same time frame show $270,166.84 in cash deposits that were not reflected on the W-2's prepared by Paychex.

>   2.   *Businesses Owned by James and Brandy as a Result of Operating the Target Clinic*

209.   The W-2's obtained from Paychex also show the following additional salaries (totaling $120,550) earned by JAMES and BRANDY for 2011 and 2012, from BMS Enterprises LLC, Bones & Brew Inc., and J & L Masonry, Inc.:

| BMS Enterprises, LLC Employees | 2012 W-2 Salary |
|---|---|
| JAMES | $22,500.00 |
| BRANDY | $22,500.00 |
| **Total** | **$45,000.00** |

| J & L Masonry, Inc. Employees | 2012 W-2 Salary |
|---|---|
| JAMES | $18,000.00 |
| BRANDY | $18,000.00 |
| **Total** | **$36,000.00** |

| Bones & Brew, Inc. Employees | 2011 W-2 Salary | 2012 W-2 Salary |
|---|---|---|
| JAMES | $12,500.00 | $5,350.00 |
| BRANDY | $13,750.00 | $7,950.00 |
| **Total** | **$26,250.00** | **$13,300.00** |

210.   According to the Florida Department of State, Division of Corporations' (FLDSDC) records, J & L Masonry, Inc. was started in 1996.   Its name was changed to J

& L Lawn Care and Masonry, Inc. in 2009.   JAMES is currently listed as its sole

officer/director.   J & L Lawn Care and Masonry, Inc. (hereinafter "J & L Masonry")

appears to be a legitimate business.   From a review of bank records, it appears that any

monies that are received from this business are in the form of personal checks from

customers or payroll checks from Paychex.   JAMES and BRANDY deposit checks they

receive from this company directly into almost all of their personal accounts.

211.   As will be discussed more fully below, any money obtained by JAMES and

BRANDY from both Bones & Brew d/b/a Beef 'O' Brady's and BMS Enterprises, LLC is a

direct result of the operation of the **Target Clinic**.   Therefore, any monies obtained by

JAMES and BRANDY from Bones & Brew d/b/a Beef 'O' Brady's and BMS Enterprises,

LLC are subject to forfeiture as funds traceable to the operation of the **Target Clinic**.

a.   Bones & Brew

212.   On May 27, 2011, JAMES wrote a check from his JP Morgan Chase

Account #XXXXX9885[29] in the amount of $20,000 to "Kurt Lorenzini."   The memo line of

the check said "purchase of beers."   Thereafter, on or about June 27, 2011, JAMES and

BRANDY began to receive payroll checks from Bones & Brew d/b/a Beef 'O' Brady's

(hereinafter "Bones & Brew").   According to FLDSDC's records, Lorenzini was the owner

of Bones & Brew until August 12, 2011, when he resigned as the President of the

---

[29]   Between January 1, 2011 and July 28, 2011, there was $34,347.21 deposited into this
account.   All of the funds deposited into this account during this time frame appear to be
proceeds obtained from the operation of the **Target Clinic**.   The sources of the deposits
are as follows: 1) $20,544.90 from the deposit of 5 payroll checks from the **Target Clinic**
made payable to JAMES; $11,164.06 from the deposit of 3 payroll checks from the
**Target Clinic** made payable to BRANDY; and 3) $2,638.25 from deposit of 5 third-party
payroll checks from the **Target Clinic** made payable to Thomas Koether.

company. Subsequently, on October 5, 2011, JAMES became the President and BRANDY became the Treasurer of the company.

213. I believe that the $20,000 check written to Kurt Lorenzi was to purchase an interest in Bones & Brew and that the payment of money from Paychex on behalf of Bones & Brew to JAMES and BRANDY represents investment payments and not payments from actually working at the restaurant. Indeed, from October 21-28, 2012, TFO Barrett Biggs was in the restaurant approximately four times for approximately two hours each time. During that time, TFO Biggs never saw JAMES or BRANDY working at the restaurant. I also conducted surveillance on JAMES and BRANDY on May 21 and 22, 2013. During that time, which totaled approximately 10 hours, neither JAMES nor BRANDY ever went to the restaurant.

214. Consequently, because JAMES purchased his interest in Bones & Brew with funds directly traceable to the operation of the **Target Clinic**, all funds that he & BRANDY receive from Bones & Brew are traceable to proceeds obtained from controlled substance offenses and are, therefore, subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6).

b.    BMS Enterprises, LLC

215. According to FLDSDC's records, on March 28, 2011, JAMES and BRANDY established BMS Enterprises, LLC. BRANDY and JAMES serve as sole managing members of BMS Enterprises, LLC. Based upon a review of bank records associated with this business, it appears the business was set up in order to manage several rental properties purchased by JAMES and BRANDY with proceeds obtained from or traceable to the **Target Clinic**. Specifically, it is believed that every property mentioned in this

72

affidavit, except for the property located at 765 Hall Street, is a rental property managed by BMS Enterprises, LLC.   Interestingly, even though BMS Enterprises has a business bank account at SunTrust Bank, JAMES and BRANDY deposit rent and payroll checks into their personal accounts. The purchase of the Defendant Properties all involved financial transactions conducted with $10,000 or more in criminal proceeds.

### TRACING OF FUNDS USED TO PURCHASE THE DEFENDANT PROPERTIES

216.   JAMES and BRANDY utilized three of their bank accounts to purchase the properties sought for forfeiture:

**I.     JP Morgan Chase, NA Savings Account #XXXXXX7996 held in the Name of James Long**

217.   JP Morgan Chase, NA Savings Account #XXXXXX7996 held in the name of James Long was opened on August 18, 2010 with a $500.00 cash deposit. JAMES was the only signature authority on the account.

218.   From August 19, 2010 through December 31, 2010, approximately $130,789.26 was deposited into this account.   JAMES made the following deposits traceable to the operation of the **Target Clinic** into this account:

a.      21 cash deposits totaling $101,000.00; and

b.      10 payroll checks from the **Target Clinic** totaling $29,239.26.

The only deposit that does not appear related to the operation of the **Target Clinic** was a deposit of a check from the State of Florida in the amount of $50.

219.   From January 1, 2011 until July 13, 2011, when the account was closed, approximately $172,285.71 was deposited into this account. JAMES made the following deposits traceable to the operation of the **Target Clinic** into this account:

a.      22 cash deposits totaling $98,600 into savings account; and

b.      22 payroll checks from the **Target Clinic** totaling $71,287.71.

The only deposits not related to the operation of the Target Clinic were 7 checks from J & L Masonry totaling $2,398.00.

220.   In 2011, BRANDY and JAMES purchased the real properties located at 742 Donau NW, Palm Bay, FL, 1690 Sawgrass Drive SW, Palm Bay, FL, and 117   Circle SE, Palm Bay, FL with funds from this account.

A.      _1690 Sawgrass Drive SW, Palm Bay, Florida_

221.   On May 25, 2011, JAMES and BRANDY signed a contract to purchase this property for $115,000.   On June 29, 2011, JAMES obtained a cashier's check in the amount of $112,673.83 made payable to Alliance Title Insurance Agency from this account in order to complete the purchase of this property.

222.   On October 26, 2011, a Quit Claim Warranty Deed was filed transferring this property from JAMES and BRANDY to BMS Enterprises, LLC.   It is believed that JAMES and BRANDY rent this property.

223.   Because this property was purchased with at least $112,673.83 in drug proceeds, this property, up to $112,673.83 is subject to forfeiture as proceeds obtained or traceable to controlled substance violations, pursuant to 21 U.S.C. § 881(a)(6). Additionally, the purchase of this property also violated 18 U.S.C. § 1957(a) because it involved a monetary transaction conducted with more than $10,000 in criminally derived funds and, as such, the entire property is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

74

B.    *742 Donau Avenue NW, Palm Bay, Florida*

224.    On March 25, 2011, JAMES and BRANDY signed a contract to purchase this property for $45,000.00.   On March 31, 2011, JAMES wire transferred $43,433.69 from this account to Peer Title in order to complete the purchase of this property.   The property was titled in the name of BMS Enterprises, LLC. It is believed that JAMES and BRANDY rent this property.

225.    Because this property was purchased with at least $45,000.00 in drug proceeds, this property, up to $45,000.00 is subject to forfeiture as proceeds obtained or traceable to controlled substance violations, pursuant to 21 U.S.C. § 881(a)(6). Additionally, the purchase of this property also violated 18 U.S.C. § 1957(a) because it involved a monetary transaction conducted with more than $10,000 in criminally derived funds and, as such, the entire property is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

C.    *117  Circle SE, Palm Bay, Florida*

226.    On January 18, 2011, JAMES signed a contract to purchase this property for $164,000. The closing was conducted by Peninsula Title Services, LLC on January 31, 2011.   On January 29, 2011, LONG obtained a cashier's check in the amount of $79,432.08 from this account.   On January 29, 2011, BRANDY obtained a cashier's check in the amount of $80,000 from Wachovia Bank Account #XXXXXXXXX2157 held in

75

the name of James and Brandy Long.[30]  Both checks, which totaled $159,432.08, were

used to complete the purchase of this property.

227.   On October 26, 2011, a Quick Claim Warranty Deed was filed transferring

this property from JAMES to JAMES and BRANDY, as husband and wife.   JAMES and

BRANDY lived in this property until they purchased the property located at 765 Hall Road.

It is believed that they now rent this property.

228.   Because this property was purchased with at least $79,432.08[31] in drug

proceeds, this property, up to $79,432.08 is subject to forfeiture as proceeds obtained or

traceable to controlled substance violations, pursuant to 21 U.S.C. § 881(a)(6).

Additionally, the purchase of this property also violated 18 U.S.C. § 1957(a) because it

involved a monetary transaction conducted with more than $10,000 in criminally derived

funds and, as such, the entire property is subject to forfeiture pursuant to 18 U.S.C. §

981(a)(1)(A).

**II.    Wells Fargo Savings Account #XXXXXXXXX2157 held in the name of James and Brandy Long**

229.   On January 6, 2011, this account was opened by James and Brandy Long

with $12.25 in cash and an interbank transfer in the amount of $86,255.06 from Wells

---

[30]    As will be discussed more fully below, in 2011, this account was funded almost
entirely with proceeds obtained from or traceable to the **Target Clinic.**
[31]    To be conservative, no funds obtained from the $80,000 check from Wachovia Bank
Account #XXXXXXXXX2157 held in the name of James and Brandy Long were used in
this calculation even though the check contained funds traceable to the operation of the
**Target Clinic.**

Fargo Money Market account #XXXXXXXXX8115.[32]   JAMES and BRANDY hold sole signature authority on this account.

A.  *784 Trinidad Avenue SE, Palm Bay, Florida*

230.   On February 11, 2011, JAMES signed a contract to purchase this property for $27,000.00.    On March 21, 2011, JAMES wire transferred $26,915.48 from this account to Lawyers Advantage Title Group for the purchase of this property. On October 26, 2011, a Quick Claim Warranty Deed was filed transferring this property from JAMES to BMS Enterprises, LLC.   It is believed that JAMES and BRANDY rent this property.

231.   Bank records show that from the opening of the account until the wire transfer for the final payment on this property on March 21, 2011, JAMES deposited $46,033.14 in payroll checks from the **Target Clinic** and $25,200 in cash obtained from the operation of the **Target Clinic** for a total of $71,233.14.   The only legitimate funds deposited into this account during this time were from J & L Masonry, and those funds totaled $3,640.35.

232.   Even assuming all of the funds obtained from J & L Masonry ($3,640.35) were used in the purchase of this property, JAMES and BRANDY would still have used at least $23,275.13 in funds obtained from or traceable to the operation of the **Target Clinic** to purchase this property.

---

[32]   This account appears to have been funded almost entirely with proceeds obtained from the **Target Clinic**.   Specifically, between October 8, 2010 and January 6, 2011, there was $100,153.21 in deposits into this account.   Of that amount, at least $99,868.21 appears to be proceeds obtained from the operation of the Target Clinic.   The sources of the deposits are as follows: $64,850.00 from 12 cash deposits; $35,018.21 from the deposit of 7 payroll checks from the **Target Clinic** made payable to JAMES; and $285.00 from Lawn Care fees.

233.   Because this property was purchased with at least $23,275.13 in drug proceeds, this property, up to $23,275.13 is subject to forfeiture as proceeds obtained or traceable to controlled substance violations, pursuant to 21 U.S.C. § 881(a)(6). Additionally, the purchase of this property also violated 18 U.S.C. § 1957(a) because it involved a monetary transaction conducted with more than $10,000 in criminally derived funds and, as such, the entire property is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

B.    *3740 Corey Road, Grant Valkaria, Florida and 2310 Wood Street, Melbourne, Florida*

234.   On July 23, 2011, JAMES and BRANDY signed a contract to purchase the property located at 3740 Corey Road for $115,000. On or about August 31, 2011, JAMES and BRANDY obtained a cashier's check in the amount of $114,001.12 made payable to Principal Title Services in order to complete the purchase of this property.

235.   Thereafter, on August 18, 2011, JAMES signed a contract to purchase the properties located at 2310 Wood Street for $85,000.   On or about September 1, 2011, JAMES obtained a cashier's check in the amount of $79,528.43 from this account to complete the purchase of these properties.   On October 26, 2011, a Quit Claim Warranty Deed was filed transferring these properties from JAMES to BMS Enterprises, LLC.   It is believed that JAMES and BRANDY rent these properties.

236.   Bank records reflect that from March 22, 2011 until August 31, 2011, JAMES deposited $140,780.86 in payroll checks from the **Target Clinic** and $36,000 in cash obtained from the operation of the **Target Clinic** for a total of $176,780.86.

78

237.   Additionally, on July 6, 2011, JAMES deposited $57,540.81 from a cashier's check from the closing of JAMES' JP Morgan Chase Accounts #XXXXXX7996[33] and #XXXXXX9885[34] into this account.

238.   The only legitimate funds deposited into this account during this time were from J & L Masonry, and those funds totaled $5,503.18.

239.   Even assuming all of the funds obtained from J & L Masonry ($5,503.18) were used to purchase these two properties, JAMES and BRANDY would still have used at least $188,026.37 in funds obtained from or traceable to the operation of the **Target Clinic** to purchase these two properties.

240.   Because the property located at 3740 Corey Road was purchased with at least $114,001.12 in drug proceeds, this property, up to $114,001.12 is subject to forfeiture as proceeds obtained or traceable to controlled substance violations, pursuant to 21 U.S.C. § 881(a)(6).   Because the property located at 2310 Wood Street was purchased with at least $79,528.43 in drug proceeds, the property, up to $79,528.43 is subject to forfeiture as proceeds obtained or traceable to controlled substance violations, pursuant to 21 U.S.C. § 881(a)(6).   Additionally, the purchase of these two properties also violated 18 U.S.C. § 1957(a) because they involved monetary transactions

[33]   As stated above, there was only $50.00 in "legitimate" funds deposited into this account.

[34]   Between January 1, 2011 and July 28, 2011, there was $34,347.21 deposited into this account.   All of the funds deposited into this account during this time frame appear to be proceeds obtained from the operation of the **Target Clinic**.   The sources of the deposits are as follows: 1) $20,544.90 from the deposit of 5 payroll checks from the **Target Clinic** made payable to JAMES; $11,164.06 from the deposit of 3 payroll checks from the **Target Clinic** made payable to BRANDY; and 3) $2,638.25 from deposit of 5 third-party payroll checks from the **Target Clinic** made payable to Thomas Koether.

conducted with more than $10,000 in criminally derived funds and, as such, both properties are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

     C.     *712 Norse Street NW, Palm Bay, Florida*

     241.     On September 29, 2011, JAMES and BRANDY signed a contract to purchase this property for $70,000.   On January 13, 2012, JAMES wired transferred $70,429.30 from this account to Alliance Title Insurance Agency account to complete the purchase of the property. It is believed that JAMES and BRANDY rent this property.

     242.     Bank records reflect that from September 2, 2011 until January 13, 2012, JAMES deposited $52,615.45 in payroll checks from the **Target Clinic** and $16,300 in cash obtained from the operation of the **Target Clinic** for a total of $68,915.45.

     243.     The only other deposit that occurred during this time was a check for $3,215 from JAMES' real estate agent relating to a sale of another piece of property owned by JAMES.

     244.     Even assuming all of the funds obtained from the sale of JAMES' other property ($3,215) were used in the purchase of this property, JAMES and BRANDY would still have used at least $65,700.45 in funds obtained from or traceable to the operation of the **Target Clinic** to purchase this property.

     245.     Because this property was purchased with at least $65,700.45 in drug proceeds, this property, up to $65,700.45 is subject to forfeiture as proceeds obtained or traceable to controlled substance violations, pursuant to 21 U.S.C. § 881(a)(6). Additionally, the purchase of this property also violated 18 U.S.C. § 1957(a) because it involved a monetary transaction conducted with more than $10,000 in criminally derived

funds and, as such, the entire property is subject to forfeiture pursuant to 18 U.S.C. §

981(a)(1)(A).

II.   **SunTrust Bank Account #XXXXXXXXX1597 held in the name of James and Brandy Long**

246.   This account was opened on June 27, 2011, with JAMES and BRANDY

having sole signature authority on the account.

A.   *765 Hall Road, Malabar, Florida*

247.   On December 15, 2011, JAMES and Brandy signed a contract to purchase

this property for $495,000. On January 17, 2012, check #1021 in the amount of

$10,000.00 made payable to South Island Real Estate was written for the initial payment

on this property. The memo line on the check stated "765 Hall Road."

248.   The settlement statement shows that JAMES and BRANDY took out a loan

in the amount of $250,000 and then owed $253,302.24 to complete the purchase of this

property.   On March 29, 2012, JAMES and BRANDY wired transferred $253,302.24 from

this account to the Closing Place Title Company in order to complete the purchase of this

property.   JAMES and BRANDY currently reside at this property.

249.   Bank records reflect that from the time this account was opened until the

time that the March 29, 2012 wire transfer was conducted by JAMES and BRANDY to

purchase this property, there was a total of $351,019.79 in deposits made into this

account. The sources of the deposits are as follows:

- $252,877.71 from payroll checks obtained from the **Target Clinic**;

- $35,398.44 related to JAMES and BRANDY's interest in Bones & Brew Inc.;

- $17,410.13 from payroll service related checks from J & L Masonry, Inc.;

- $11,870.08 in payroll and rent checks from BMS Enterprises, Inc.;

- $31,735 from 20 cash deposits; and

- $4,700 obtained from Western Union Money Orders.

250.    Even assuming all of the funds obtained from J & L Lawn Masonry, Inc. ($17,410.13) and the money orders ($4,700)[35] were used in the purchase of this property, JAMES and BRANDY would still have used at least $231,192.11 in funds obtained from or traceable to the operation of the **Target Clinic** to purchase this property.

---

[35]    The source of the money orders is unknown.   As a result, I am including them as "legitimately earned" funds even though they could be traceable to funds obtained from the **Target Clinic**.

82

251.   Because this property was purchased with at least $231,192.11 in drug proceeds, this property, up to $231,192.11 is subject to forfeiture as proceeds obtained or traceable to controlled substance violations, pursuant to 21 U.S.C. § 881(a)(6). Additionally, the purchase of this property also violated 18 U.S.C. § 1957(a) because it involved a monetary transaction conducted with more than $10,000 in criminally derived funds and, as such, the entire property is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

Keith C. Whitmore
Task Force Officer
Drug Enforcement Administration

State of Florida
County of Orange

Before me, the undersigned authority personally appeared, Task Force Agent Keith C. Whitmore, who having produced his DEA credentials as identification and having being duly sworn, deposes and says that the foregoing Affidavit is true to the best of his knowledge, information and belief.  Witness my hand and official seal in the State of Florida, County of Orange this _14_ day of June, 2013.



Notary Public
Commission Expires: 5/26/15

LISA M. TENHENGEL
Commission # EE 098003
Expires May 26, 2015
Bonded Thru Troy Fain Insurance 800-385-7019